# IN THE SUPREME COURT OF IOWA

No. 09–0724

Filed December 16, 2011

**CEDAR RAPIDS COMMUNITY SCHOOL DISTRICT**
and **EMC INSURANCE COMPANIES,**

Appellants,

vs.

**CHRISTINE PEASE,**

Appellee.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Scott D. Rosenberg, Judge.

On further review, we address whether substantial evidence supports the workers' compensation commissioner's findings of fact. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

Tina M. Eick and Wendy D. Boka of Hopkins & Huebner, P.C., Des Moines, for appellants.

Thomas M. Wertz and Daniel J. Anderson of Wertz & Dake, Cedar Rapids, for appellee.

**APPEL, Justice.**

In this workers' compensation case, we consider whether the court of appeals properly applied the "substantial evidence" test under Iowa Code section 17A.19(10)(*f*) (2009) when it reversed an award of benefits in an appeal of a decision of the workers' compensation commission. Based on our review of the record, we conclude substantial evidence supports the commissioner's findings. As a result, we vacate the decision of the court of appeals and affirm the judgment of the district court.

## I. Factual and Procedural Background.

Christine Pease injured her right ankle when she slipped on ice and fell in the course of her employment with the Cedar Rapids Community School District (District) as a "job coach." The position of job coach involved working with disabled children, transporting them to various locations in the community in the school van.

Pease filed a claim with the workers' compensation commission seeking benefits as a result of her alleged injuries. While the parties stipulated that Pease suffered a right ankle injury as a result of the slip and fall and that the injury arose within the scope of employment, the District disputed "the nature, scope and effect of the injury."

Pease's ankle injury required her to undergo two surgeries related to the placement and removal of a screw. In addition, Pease claimed that her fall caused her to have an altered gait, which in turn caused her to sustain an injury to her left ankle and back. Pease further maintained that her injuries increased her preexisting state of depression.

At the hearing, Pease offered evidence in support of her claim that her right ankle injury caused a change in gait which subsequently caused injuries to her left ankle and back. With respect to her right

ankle, Pease offered the testimony of a physician that she suffered "a rather significant ligamentous injury to her right ankle involving both the deltoid and syndesmotic ligament." She then reported to another physician that she began experiencing low back pain due to her altered gait. Although Pease sought treatment for lower back pain before, her physician noted that her back pain had become more difficult to control after her fall. In addition, Pease reported that she began to experience pain in her left ankle due to her altered gait. Pease, however, had a history of problems with her left ankle, which included a chronic tear of ligaments and two arthroscopic surgeries prior to her slip and fall involved in this case.

According to Pease, after she had reached maximum medical improvement she was asked to undergo a functional capacity evaluation. The results of the functional capacity evaluation indicated that Pease could stand or walk no more than fifty percent of her work shift and for limited durations; could lift twenty pounds rarely, fifteen pounds occasionally, and seven to eight pounds frequently; could tolerate a maximum of ten to twelve stairs up and down once a day using handrails for support; and should avoid ladder or step climbing greater than an eight inch height. Her physician characterized these work restrictions as "permanent."

More than four months later, the District terminated Pease's employment. The District stated that Pease had been unable to return to work since her injury and, in light of the permanent restrictions, she was unable to perform the essential functions of the position of job coach or any other job with the District in her pay range.

After her termination from employment, Pease became increasingly depressed and sought medical help for this condition. Pease had a

history of depression prior to her work injury, but testified her depression became much worse following the injury. She testified that her constant pain, inability to walk, loss of her job, and her increased stress levels all contributed to her depression and that the depression interfered with her concentration, her sleep, and her social life.

Pease offered expert medical testimony in support of her claim that she suffered deeper depression as a result of her work injury. Dr. William Stutts, a psychiatrist, concluded that Pease's work injury was a "substantial contributing factor[] in bringing about her current level of depression." Dr. Stutts asserted it was more likely than not that the chronic pain resulting from her injuries was permanent and that the pain would continue to contribute to Pease's depression. Another physician, Dr. John Brownell, characterized Pease as suffering from a "pretty clear case of post-surgical depression" and further stated that the depression was a result of both the stress of the surgery and her decreased mobility.

Pease offered the opinion of Barbara Laughlin, a vocational expert, in support of her claim that she was no longer employable. Laughlin asserted that Pease suffered a ninety to one hundred percent loss of access to the labor market as a result of her injuries. Laughlin stated that Pease would have great difficulty finding and maintaining employment in light of her inability to interact appropriately with peers, the general public, and supervisors.

The District countered by offering evidence that tended to characterize Pease's injuries as less substantial. After performing an independent medical examination, Dr. Ray Miller opined that Pease had an eight percent of the whole person impairment due to the right ankle injury and the subsequent sequelae to the back and left ankle.

With respect to the claim of depression, the District offered evidence from Dr. Raymond Crowe indicating that Pease's depressive episode was not causally connected to the injury. Dr. Crowe later asserted that Pease was malingering.

The District offered a vocational report prepared by Dr. Elizabeth Mease and Dr. Janeen Montgomery. They opined that Pease was employable at the sedentary physical level and was not psychiatrically foreclosed from employment.

The deputy commissioner ruled in favor of Pease. The deputy concluded that Pease suffered "an injury to the body as a whole." Additionally, the deputy found that Pease's work injury was a "substantial contributory factor in [Pease's] current state of depression." Further, the deputy held that as a result of her physical and psychological injuries, Pease was "unable to return to any job she ha[d] previously held." As a result, the deputy awarded Pease permanent total disability, accrued benefits, and reimbursement for medical expenses.

The commissioner affirmed the decision of the deputy, but modified and expanded on the deputy's ruling. The commissioner noted that the deputy had erroneously stated that Dr. Miller had assigned an eight percent permanent disability rating to the injuries to the right ankle, neck, lower back, and left ankle when, in fact, Dr. Miller assigned the disability rating based only on the injuries to Pease's lower back and left ankle. The commissioner concluded that this error had no impact on the case.

The commissioner further considered whether the deputy erred in failing to apportion Pease's alleged preexisting disability. The commissioner noted that this issue was not raised before the deputy and was not preserved for appeal.

The district court affirmed in part and reversed in part. The district court first concluded that the commissioner applied the appropriate standard of review and correctly held the District failed to preserve error on the apportionment issue. The district court also upheld the commissioner's findings of fact with respect to the causation of Pease's mental and physical injuries. The court observed that the commissioner favored the findings of Dr. Miller and Dr. Stutts and concluded that, on the whole, substantial evidence supported the commissioner's findings. Further, the district court held that substantial evidence supported the commissioner's findings regarding disability. The court reversed, however, the commissioner's award of medical expenses for Pease's neck injuries because there were no findings to establish that the neck injuries were caused by the January 26 accident. The District appealed, and the court of appeals reversed and remanded.

The court of appeals held substantial evidence did not support the commissioner's findings on causation. The court questioned the reliability of Dr. Miller's conclusions, observing that Dr. Miller's reliance on the history provided by Pease was misplaced because other evidence, including video surveillance, undermined Pease's credibility. Additionally, the court noted that Dr. Miller incorrectly believed Dr. Kline opined that Pease's back pain was caused by the January 26 accident when, in fact, Dr. Kline concluded the opposite. Further, the court questioned the conclusions of Dr. Stutts, explaining that Dr. Stutts' opinion rested, in part, on an inaccurate and incomplete history of depression provided by Pease. Finally, the court discussed the conflicting evidence and Pease's "lengthy history of symptoms" relating to the injuries and concluded medical causation was lacking between the January 26 accident and the injuries to Pease's left ankle, lower back,

and postaccident level of depression. Pease applied for further review, which we granted.

## II. Standard of Review.

Our decision is controlled in large part by the deference we afford to decisions of administrative agencies. Medical causation presents a question of fact that is vested in the discretion of the workers' compensation commission. *See Dunlavey v. Econ. Fire & Cas. Co.*, 526 N.W.2d 845, 853 (Iowa 1995). We will therefore only disturb the commissioner's finding of medical causation if it is not supported by substantial evidence. *See* Iowa Code § 17A.19(10)(*f*).

The Iowa Administrative Procedure Act defines "substantial evidence" as follows:

> [T]he quantity and quality of evidence that would be deemed sufficient by a neutral, detached, and reasonable person, to establish the fact at issue when the consequences resulting from the establishment of that fact are understood to be serious and of great importance.

*Id.* § 17A.19(10)(*f*)(1). When reviewing a finding of fact for substantial evidence, we judge the finding "in light of all the relevant evidence in the record cited by any party that detracts from that finding as well as all of the relevant evidence in the record cited by any party that supports it." *Id.* § 17A.19(10)(*f*)(3). Our review of the record is "fairly intensive," and we do not simply rubber stamp the agency finding of fact. *Wal-Mart Stores, Inc. v. Caselman*, 657 N.W.2d 493, 499 (Iowa 2003).

Evidence is not insubstantial merely because different conclusions may be drawn from the evidence. *John Deere Dubuque Works of Deere & Co. v. Weyant*, 442 N.W.2d 101, 105 (Iowa 1989). To that end, evidence may be substantial even though we may have drawn a different conclusion as fact finder. *Ardnt v. City of Le Claire*, 728 N.W.2d 389, 393

(Iowa 2007); *Missman v. Iowa Dep't of Transp.*, 653 N.W.2d 363, 367 (Iowa 2002). Our task, therefore, is not to determine whether the evidence supports a different finding; rather, our task is to determine whether substantial evidence, viewing the record as a whole, supports the findings actually made. *See* Iowa Code § 17A.19(10)(*f*); *Schutjer v. Algona Manor Care Ctr.*, 780 N.W.2d 549, 557–58 (Iowa 2010).

### III. Discussion.

At the heart of this case is the issue of the extent to which expert testimony constitutes substantial evidence in a workers' compensation claim. Experts for the parties gave conflicting opinions regarding the causation of Pease's postaccident physical and psychological injuries. The commissioner ultimately determined the expert opinions offered by Pease were more credible and gave their opinions more weight. The District now asks us to hold that the opinions relied upon by the commissioner were so flawed that they failed to constitute substantial evidence supporting the commissioner's findings. We decline to do so.

Medical causation "is essentially within the domain of expert testimony." *Dunlavey*, 526 N.W.2d at 853. The commissioner, as trier of fact, has a duty to weigh the evidence and measure the credibility of witnesses. *Id.* The weight given to expert testimony depends on the "accuracy of the facts relied upon by the expert and other surrounding circumstances." *Schutjer*, 780 N.W.2d at 560 (internal quotation marks omitted). Also, an expert's opinion is not necessarily binding upon the commissioner if the opinion is based on an incomplete history. *Dunlavey*, 526 N.W.2d at 853. Ultimately, however, the determination of whether to accept or reject an expert opinion is within the "peculiar province" of the commissioner. *Deaver v. Armstrong Rubber Co.*, 170 N.W.2d 455, 464 (Iowa 1969). The District challenges the

commissioner's medical causation findings relating to Pease's left ankle and lower back as well as her postaccident level of depression. We discuss each separately.

**A. Medical Causation of Pease's Left Ankle and Lower Back Injuries.** The commissioner primarily relied upon the opinions of Dr. Miller in concluding Pease's work injury aggravated the injuries to her left ankle and lower back. Dr. Miller performed an independent medical examination of Pease in March 2006. Dr. Miller reviewed medical records from Physicians' Clinic of Iowa, the University of Iowa Orthopedic Department, Dr. Brownell, Dr. Fortson, St. Luke's Hospital, Dr. Kline, St. Luke's Therapy Plus, University of Iowa Psychiatry Department, and Jennifer Bradley ARNP from Mercy Psychiatric Center. He also had x-rays available from St. Luke's Hospital and the Physicians Clinic of Iowa. In addition to reviewing Pease's medical records, Dr. Miller personally performed a physical examination of Pease. Based on his review of the medical records and his personal examination, Dr. Miller opined to a reasonable degree of medical certainty that Pease's left ankle and lower back injuries were aggravated by the January 26, 2005 accident.

Dr. Miller explained that the injury to Pease's right ankle aggravated her "preexisting osteoarthritis of the left ankle." Dr. Miller observed that Pease experienced "an increase in . . . symptoms of pain related to weight-bearing that have continued since the time of the fall of 01/26/2005, and, therefore, are felt to be an aggravation of a preexisting condition." Dr. Miller's observations of an increase in symptoms of pain following the accident are consistent with the medical reports submitted to him for his evaluation.

Pease's ankle symptoms appeared to progress after the accident so she returned to the University of Iowa and was evaluated by Dr. Saltzman on March 16, 2005. Dr. Saltzman's notes state that Pease met with Dr. Saltzman because of a "new problem in her left ankle." According to the notes, Pease was "beginning to develop more problems with the left side. . . . What has added to this is that she fell on the ice and tore the syndesmosis and deltoid ligament on her right ankle." After a CT scan and radiological examination, Dr. Saltzman's impression was that Pease suffered central heel pain and left ankle pain.

In April 2005, Dr. Amendola assumed the care for Pease's left ankle. Pease visited Dr. Amendola on three occasions between April and August 2005. According to Dr. Amendola's notes, Pease advised in April that she experienced some improvement with her left ankle once she was able to bear weight on the right. Throughout the five months, however, Pease reported that she continued to experience pain in her left ankle.

In December 2005, Dr. Amendola wrote a letter to the District's counsel. In the letter, Dr. Amendola advised he had been involved in the care of Pease from March through August of that year "for, what appears to be, an exacerbation of a pre-existing condition." Dr. Amendola continued, explaining, "I do agree that this patient had ongoing pre-existing problems in her ankle. Therefore, this note is to clarify, in writing, that in fact this was an aggravation of a pre-existing condition."

From this review of the record, it is apparent that substantial evidence supports the commissioner's finding of medical causation with respect to the left ankle. Dr. Miller opined to a reasonable degree of medical certainty that the symptoms Pease experienced in her left ankle were aggravated by the increased weight-bearing requirements stemming from the January 26, 2005 accident. Dr. Miller's opinion is supported by

the reports of Dr. Saltzman and Dr. Amendola, which Dr. Miller reviewed in formulating his opinion. Also, Dr. Amendola expressed the view that the left ankle problems suffered by Pease following the accident were an aggravation of a preexisting condition.

Substantial evidence also supports the commissioner's finding of medical causation between the work-related accident and the aggravation of Pease's lower back symptoms. As with the left ankle, the commissioner relied on Dr. Miller's opinion concluding within a reasonable degree of medical certainty that the January 26, 2005 accident aggravated Pease's preexisting back condition. Dr. Miller explained:

> Regarding Ms. Pease's low back, for which she had a preexisting facet arthropathy in the lower lumbar levels, following her fall of 01/26/2005 she developed an increase in her low back symptoms that have persisted and have required further treatment that did not substantially alleviate her symptoms. I would agree with Dr. Kline's assessment that Ms. Pease has had an increase in her low back symptoms following the work related injury of 01/26/2005 regarding her low back, and these are related to the required use of crutches following surgery on her right ankle and alterations in her gait pattern because of the symptoms related to both ankles.

Dr. Miller thus attributed the aggravation of Pease's lower back symptoms to her altered gait and use of crutches following the injury to her right ankle.

The District, however, argues Dr. Miller's opinion is suspect in part because he relied on Dr. Kline's assessment which, according to the District, "was directly to the contrary" of Dr. Miller's conclusions. The District relies on a letter written by Dr. Kline, who began treating Pease before her accident, in which Dr. Kline stated he "would not attribute [Pease's] *ongoing* need for treatment of her back to her ankle injury of

01/26/2005." Yet Dr. Kline specifically stated that he could not determine within a reasonable medical certainty that a causal relationship existed between Pease's postaccident back pain and her right ankle injury. Dr. Kline's letter, therefore, does not wholly undermine Dr. Miller's conclusions.

In fact, Dr. Kline's medical records generally support Dr. Miller's conclusions. In an operative report dated May 2, 2005, Dr. Kline observed that Pease "did well after her initial epidural steroid injection in January. However, she subsequently experienced a fall and injured her right ankle. *This reinjured her back. Her back pain has been more difficult to control since that time.*" (Emphasis added.) In another report dated July 26, 2005, Dr. Kline stated:

> The patient was initially seen in the clinic in January 2005. She underwent an epidural steroid injection. This resulted in marked improvement in her ankle, as well as her pain. However, she subsequently experienced a fall and reinjured her right ankle, *as well as her back.*

(Emphasis added.) Thus, although Dr. Kline could not opine within a reasonable degree of medical certainty whether Pease's postaccident lower back symptoms were caused by the injury to her right ankle, his medical notes are consistent with Dr. Miller's opinion in this regard.

The court of appeals regarded Dr. Miller's expert opinions unreliable because Dr. Miller relied upon a "questionable" history provided by Pease. The court noted that the evidence, including video surveillance footage, directly contradicted Pease's testimony and undermined her credibility. As we have stated before, however, credibility determinations in workers' compensation claims are within the domain of the commissioner as trier of fact. Certainly, there are cases in which witness testimony may be "so impossible or absurd and self-

contradictory that it should be deemed a nullity by the court," *Graham v. Chi. & N.W. Ry.*, 143 Iowa 604, 615, 119 N.W. 708, 711 (1909), but this is no such case.

First, Dr. Miller did not rely solely upon the history provided by Pease in his evaluation. Dr. Miller also performed a physical examination of Pease and reviewed medical records detailing Pease's medical history. After performing the physical and reviewing the medical records, Dr. Miller—who is a board certified orthopedic surgeon, board certified in occupational medicine, and board certified in performing independent medical evaluations—concluded within a reasonable degree of medical certainty that the injury to Pease's right ankle aggravated her symptoms of pain in her left ankle and lower back. The District presented no expert opinion calling Dr. Miller's opinions into question within a reasonable degree of medical certainty. Thus, even if the video surveillance raised doubts about Pease's credibility, the commissioner could nevertheless reasonably rely upon the opinion of Dr. Miller.

Second, Dr. Miller's conclusions did not change after he viewed the video surveillance footage. Dr. Miller wrote a letter to Pease's attorney following a review of the surveillance videos. In the letter, Dr. Miller stated, "[I]t is my opinion within a reasonable degree of medical certainty, that my report with its conclusions and impairment recommendations, remains accurate and appropriate." Dr. Miller explained Pease will experience "good days and bad days regarding her symptoms and activity level that can affect her gait pattern and her use of ankle supports and braces." Thus, Dr. Miller's opinion, which the commissioner called "in-depth and substantiated," was unaffected by the video surveillance footage.

Third, video surveillance footage depicting a claimant performing tasks inconsistent with the claimed disability is hardly a smoking gun. "Although on the surface it might appear that nothing could be more cogent and a more dramatic refutation of a disability claim than motion pictures of a claimant jacking up a car or playing tennis," Professor Larson explains, "the courts have rightly observed that such evidence must be used with great caution." 7 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* § 127.10, at 127-46 (2010). In *Gagliano v. Boh Brothers Construction Co.*, 44 So. 2d 732, 735 (La. Ct. App. 1950), the Court of Appeal of Louisiana cautioned the use of motion pictures and noted that a "spirit of fair play" requires motion pictures to "reflect all activities of the subject of the pictures, and not merely snatches or fragments." Also, in *Ferraro v. Zurcher*, 79 A.2d 473 (N.J. Super. Ct. App. Div. 1951), the Superior Court of New Jersey cautioned against the use of heavily edited motion pictures that consolidate isolated incidents taken over a span of three years into a fifteen minute film. "This presentation of isolated incidents occurring at widely separated times," the *Ferraro* court explained, "gives the deceptive impression of a continuing performance and tends to cause the viewer to infer that petitioner has a capacity for sustained effort, which clearly is not the fact." *Ferraro*, 79 A.2d at 478; *see also Lambert v. Wolf's, Inc.*, 132 So. 2d 522, 527 (La. Ct. App. 1961) (admitting motion picture evidence with caution because it failed to show rest periods, did not reflect pain, and did not show the after effects of the subject's activities); *DeChandt v. N.D. Workers Comp. Bureau*, 452 N.W.2d 82, 85 (N.D. 1990) (holding workers' compensation bureau's reliance on audio and videotapes failed to adequately explain reasons for disregarding medical evidence).

In this case, the video surveillance footage is not of such a character as to completely undermine Pease's credibility. All told, the video contains less than forty minutes of Pease walking and shopping during the two-year period between her work injury and the hearing. The surveillance footage is fragmented, depicting Pease for brief intervals of time. Even the longest segment, which lasted less than a half hour, is not continuous and is missing nearly five minutes. We acknowledge the video does tend to impeach the credibility of Pease as it shows she did not always wear her brace and, on at least one occasion, wore sandals. It was the duty of the commissioner, however, to weigh the evidence as a whole, taking into consideration the credibility of the witnesses, and determine whether Pease's right ankle injury aggravated the symptoms of Pease's left ankle and lower back. *See Burns v. Bd. of Nursing*, 495 N.W.2d 698, 699 (Iowa 1993) ("Because review is not de novo, the court must not reassess the weight to be accorded various items of evidence."). Viewing the record as a whole, the commissioner may have reasonably concluded the fragmented video surveillance footage did not entirely undercut Pease's credibility or the opinions of Dr. Miller.

Substantial evidence therefore supports the commissioner's finding of medical causation with respect to Pease's left ankle and lower back. The court of appeals erred in holding otherwise.

**B. Medical Causation of Pease's Postaccident Level of Depression.** We also conclude substantial evidence supports the commissioner's finding that Pease's work injury aggravated her depression. The commissioner and deputy commissioner principally relied on the medical opinions of Dr. Stutts. Dr. Stutts concluded Pease suffered from Major Depressive Disorder, Recurrent following her work accident. He opined to a reasonable degree of medical certainty that

Pease's work injury was "a substantial factor in bringing about her current level of depression" and her "chronic pain was more likely than not permanent and would continue to contribute to [Pease's] level of depression." "Situational stress and chronic pain as well as limitations from injuries and ongoing litigation," Dr. Stutts explained, "have exacerbated anxiety and worsened mood substantially." Further, he noted that "[c]hronic pain and depression are intimately linked and serve to exacerbate one another" and "the chronic pain in Ms. Pease's ankles is a substantial contributing factor in her depression."

Dr. Stutts' conclusions were consistent with those of Jennifer Bradley, an advanced nurse practitioner under the supervision of Dr. Stutts. Following the accident, Pease met with Bradley eight separate times between June 13, 2005, and August 30, 2006. Bradley's notes of the initial diagnostic evaluation state, "Since [Pease] had ankle surgery, her depression worsened dramatically." Based on her evaluation of Pease, Bradley's impression was that Pease suffered Major Depressive Disorder, Recurrent and Severe.

Moreover, Dr. Brownell, Pease's family doctor, met with Pease on May 26, 2005, and his medical notes from the visit state that Pease was "[v]ery tearful" and that she felt "down, depressed and sad." The notes also state that Pease's symptoms of depression "all started after the problems with her right ankle." Dr. Brownell stated that this was a "[p]retty clear case of post-surgical depression." Explaining further, Dr. Brownell noted,

> I certainly think this is a Workman's Compensation issue and is caused by the surgery of her ankle, and the injury itself. I think it's a combination of both the stress of the surgery and also her decreased mobility etc, as a result of the actual injury itself.

Based on his observations and conclusions, Dr. Brownell prescribed Pease antidepressant medication and referred her to Dr. Stutts.

Not all medical professionals agreed with the conclusions of Dr. Stutts, Bradley, and Dr. Brownell, however. Dr. Crowe, a psychiatrist with the University of Iowa, evaluated Pease once in November 2005. Dr. Crowe summarized his conclusions in a letter to EMC Insurance Companies dated December 19, 2005. In the letter, Dr. Crowe stated that he diagnosed Pease with Major Depressive Disorder, but concluded that the accident did not aggravate her depression because her major depressive disorder began a year before the injury (April 2004) and that the current episode did not occur until three months after the injury. Dr. Crowe subsequently changed his diagnosis to malingering after viewing the video surveillance footage discussed above. In light of his finding of malingering, Dr. Crowe no longer had confidence in his previous diagnosis given what he perceived to be the questionable history provided by Pease. Dr. Crowe also stated, however, that he could not exclude a diagnosis of depression.

Dr. Stutts and Bradley rejected Dr. Crowe's conclusions. "We are without a doubt," they explained in a letter to Pease's attorney, "in agreement that Ms. Pease is not malingering as Dr. Crowe charges." Dr. Stutts and Bradley also noted that malingering occurs in the absence of pathology, and because Pease had been diagnosed with Major Depressive Disorder, she was not malingering. Accordingly, despite Dr. Crowe's observations, they did not change their diagnosis of Major Depressive Disorder, Recurrent, and Dr. Stutts did not alter his conclusion that Pease's work injury aggravated her depression.

The commissioner was thus confronted with a classic "battle of the experts." On the one hand, an independent psychiatric evaluation found

Pease to be malingering. On the other hand, Dr. Stutts diagnosed Pease with Major Depressive Disorder, Recurrent, and he concluded that the work injury aggravated Pease's depression. The deputy commissioner ultimately found Dr. Stutts' opinion more credible and explained that Dr. Crowe's revised diagnosis of malingering "was not based on any additional treatment of the claimant" and "ignore[d] that the claimant ha[d] actual underlying physical pathology and diagnosed recurrent major depressive disorder." He also rejected Dr. Crowe's diagnosis of malingering because Dr. Crowe's opinion "demonstrate[d] that [Pease] was reasonably stable at the time of injury and worsened following." The commissioner adopted these findings.

As we have explained, the commissioner, as fact finder, is responsible for determining the weight to be given expert testimony. *Sherman v. Pella Corp.*, 576 N.W.2d 312, 321 (Iowa 1998). The commissioner is free to accept or reject an expert's opinion in whole or in part, particularly when relying on a conflicting expert opinion. *Id.*; *see Huwe v. Workforce Safety & Ins.*, 746 N.W.2d 158, 161–62 (N.D. 2008) ("When confronted with a classic 'battle of the experts,' a fact-finder may rely upon either party's expert witness."). The courts, in their appellate capacity, "are not at liberty to accept contradictory opinions of other experts in order to reject the finding of the commissioner." *Dille v. Plainview Coal Co.*, 217 Iowa 827, 846, 250 N.W. 607, 615 (1933); *see Hinrichs v. Davenport Locomotive Works*, 203 Iowa 1395, 1397, 214 N.W. 585, 586 (1927). In this case, the commissioner relied on the opinion of Dr. Stutts who concluded Pease's work injury aggravated her depression. Dr. Stutts' conclusions were supported by the opinions of two other medical professionals who met with Pease several times following her

accident. Based on the record before us, we are satisfied that the commissioner's findings are supported by substantial evidence.

The court of appeals, however, concluded that Dr. Stutts' opinion did not amount to substantial evidence because it was based in part on the inaccurate and incomplete history of Pease's depression. Specifically, the court of appeals noted that Pease "downplayed the depression she experienced prior to her right ankle injury" when providing her history to Dr. Stutts. Also, the court stated that Dr. Stutts was "not told of the depression and medications taken before the January fall, nor was he aware of her reports to Dr. Eyanson on the day before the injury."

Before Dr. Stutts rendered his opinion, Pease met with Bradley for an initial diagnostic evaluation. Bradley's impression was that Pease suffered from Major Depressive Disorder, Recurrent. The diagnostic criteria for Major Depressive Disorder, Recurrent includes the presence of two or more Major Depressive Episodes. American Psychiatric Association, *DSM-IV-TR Mental Disorders: Diagnosis, Etiology, and Treatment* 738 (Michael B. First & Allan Tasman eds. 2004). According to the *Diagnostic and Statistical Manual of Mental Disorders-IV*, "To be considered separate episodes, there must be an interval of at least 2 consecutive months in which criteria are not met for a Major Depressive Episode." *Id.* Thus, although Bradley noted Pease's past psychiatric history was Pease "took Lexapro for a short time because she felt as though she was having some hormonal imbalance," Bradley's initial impression that Pease had Major Depressive Disorder, Recurrent, suggests Bradley was aware that Pease suffered at least one previous Major Depressive Episode.

Even assuming Pease provided inaccurate and incomplete history of her depression, Dr. Stutts was provided materials detailing Pease's

prior history with depression. Not insignificantly, Dr. Stutts received the December 19, 2005 letter in which Dr. Crowe explained Pease had been diagnosed with Major Depressive Disorder as early as April 12, 2004. Dr. Stutts also received the records of Dr. Fortson from 2004, which stated that Pease's past medical history was "remarkable for anxiety with depression." Dr. Fortson's notes also show that Pease was diagnosed with anxiety disorder with depression in 2004. Additionally, Dr. Stutts was given the records of Dr. Brownell, stating that in April 2004 Pease had "[s]ituational depression associated with anxiety." Dr. Brownell's notes also list medications prescribed by him that included antidepressants. While Dr. Stutts may not have been apprised of the reports made by Dr. Eyanson the day before the injury stating that Pease experienced symptoms of depression, Dr. Stutts received materials to apprise him of Pease's preexisting level of depression and the medications Pease took before the January fall. Therefore, the commissioner may have reasonably relied on the conclusions of Dr. Stutts in finding Pease's work injury aggravated her depression.

In sum, the commissioner's finding that Pease's preexisting depression was aggravated by her accident on January 26, 2005, is supported by substantial evidence. The commissioner relied on an opinion of a psychiatrist who concluded that Pease's work injury aggravated her depression. In addition to the medical history provided by Pease, the psychiatrist's conclusions were made after receiving several medical records showing Pease's history with depression. The conclusions were consistent with the opinions of two medical professionals who personally evaluated Pease several times following the accident. Although another expert offered a contrary opinion, the weight to be given conflicting expert opinions is within the province of the

commissioner. The commissioner's decision explained why he rejected the conflicting opinion and was otherwise sufficiently detailed to show the path the agency took through the conflicting evidence. *See Terwilliger v. Snap-On Tools Corp.*, 529 N.W.2d 267, 274 (Iowa 1995); *Catalfo v. Firestone Tire & Rubber Co.*, 213 N.W.2d 506, 510 (Iowa 1973).

**IV. Remaining Issues.**

On direct appeal, the District raised three additional issues. First, the District argued the commissioner failed to perform a de novo review of the deputy commissioner's proposed decision. Second, the District asserted that the commissioner's decision regarding disability was not supported by substantial evidence. Third, the District argued that the district court erred in awarding certain medical benefits following Pease's injury. The court of appeals held the commissioner performed a de novo review as required. Also, in light of its conclusion that substantial evidence did not support the commissioner's findings of medical causation, the court of appeals did not address the disability argument and reversed the award of medical expenses. We discuss each issue in turn.

**A. De Novo Review.** We agree with the court of appeals that the commissioner performed a de novo review of the deputy commissioner's findings. The appeal decision states:

> Upon de novo review, it is apparent that the presiding deputy relied most heavily on the opinions of Ray Miller, M.D., and Raymond Stutts, D.O., Ph.D., to find that claimants pre-existing conditions were substantially and permanently aggravated as a result of her injury of January 26, 2005. Both Dr. Miller and Dr. Stutts provide in-depth and substantiated medical opinions that are consistent with claimant's ability to maintain her employment position prior to her fall, but no longer able to maintain her employment position following her fall.

The District argues this passage "reads like substantial evidence review." We disagree. The commissioner expressly stated that he was performing a de novo review. Also, the commissioner adopted in large part the deputy commissioner's proposed decision. Consequently, his discussion focused on the reasons he adopted the deputy's findings and offered "additional analysis" explaining why he found the opinions of Dr. Miller and Dr. Stutts credible. We therefore conclude the commissioner applied the appropriate standard of review in its appeal decision.

**B. Extent of Disability.** The commissioner, adopting the deputy commissioner's findings, concluded Pease suffered a permanent and total industrial disability. Industrial disability is determined by an evaluation of the employee's earning capacity. *IBP, Inc. v. Al-Gharib,* 604 N.W.2d 621, 632 (Iowa 2000). The commissioner may consider a number of factors in determining industrial disability, including functional disability, "age, education, qualifications, experience, and [the claimant's] inability, because of the injury, to engage in employment for which [s]he is fitted." *McSpadden v. Big Ben Coal Co.,* 288 N.W.2d 181, 192 (Iowa 1980) (internal quotation marks omitted).

In finding permanent and total disability, the deputy commissioner stated:

> On January 6, 2006 the claimant was discharged by the employer because the claimant's permanent restrictions, from her work injury of January 26, 2005, were such that the school district determined that "these permanent restrictions make you unable to perform the essential functions of the position of 'job coach,' and unable to perform essential functions of any other job in the District in your pay range. . . ."

> Due to her physical restrictions, depression and pain the claimant is unable to return to any job she has previously held. The Cedar Rapids Community School District is a large employer and as such its inability to return

the claimant to work in any position is highly significant and indicative of the claimant's loss of ability to work in the competitive labor market. See *Bacon v. Ft. Dodge Animal Health,* File No. 5001168, (App. February 23, 2007)[.] Considering the claimant's medical impairments, daily pain, current training, permanent restrictions, inability of the employer to find a[n] alternative position for the claimant, as well as all other factors of industrial disability, the claimant has suffered a 100 percent loss of earnings capacity.

After a careful review of the evidence, we conclude substantial evidence supports these findings. Pease offered direct testimony and several expert opinions supporting a finding of permanent total disability. Although, as the District observes, some evidence in the record suggests Pease is capable of performing minimal physical activity, the commissioner gave more weight to the evidence in support of permanent total disability and found Pease's experts more credible. We, therefore, will not disturb the commissioner's finding that Pease suffers a permanent total industrial disability. *See Robbennolt v. Snap-On Tools Corp.,* 555 N.W.2d 229, 234 (Iowa 1996) ("The court must not reassess the weight of the evidence because the weight of the evidence remains within the agency's exclusive domain.").

The District also argues substantial evidence is lacking in the commissioner's industrial disability determination because Pease's work injury did not prevent her from returning to full-time employment; rather, Pease's preexisting, nonwork related disabilities prevented her from doing so. This argument, however, is an attempt to resurrect the District's apportionment claim. In *Second Injury Fund of Iowa v. Nelson,* 544 N.W.2d 258, 264 (Iowa 1995), we summarized our approach to apportionment, stating:

When a prior injury, condition or illness, *unrelated to employment, independently* produces an *ascertainable* portion of an injured employee's cumulative industrial

disability, the employer is liable only for that portion of the industrial disability attributable to the current injury. In other words, the industrial disability is apportioned between that caused by the work-related injury and that caused by the nonwork-related condition or injury. *Varied Enterprises, Inc. v. Sumner*, 353 N.W.2d 407, 411 (Iowa 1984). The employer is liable only for the work-related portion.

The commissioner and the district court both concluded that the District failed to preserve its apportionment claim. During the hearing before the deputy commissioner, the deputy discussed with the parties the issues in dispute. The deputy made no mention of apportionment. Before proceeding, the deputy asked the District's attorney whether there were any issues in dispute that he did not discuss. The District's attorney stated, "I do not believe so. I do not believe that there are additional issues that you have not covered." Further, in his proposed decision, the deputy did not address the apportionment claim. The District failed to file a motion for rehearing or a motion to enlarge the deputy's findings. Under these circumstances, the District failed to preserve err on its apportionment claim. *See* Iowa Admin. Code r. 876—4.28(7) ("An issue will not be considered on appeal if the issue could have been, but was not, presented to the deputy."); *cf. Freedom Fin. Bank v. Estate of Boesen*, 805 N.W.2d 802, 809 (Iowa 2011) (holding err is not preserved when the district court does not address an issue and a party fails to file a motion to enlarge findings).

**C. Medical Expenses.** Finally, the District argues Pease failed to show certain medical bills from Cardiologists PC, East Central Iowa Acute Care, Famous Footwear, and Dr. Brownell were related to her work injury. Specifically, the District asserts Pease failed to establish a causal connection between her work injury and medical expenses she incurred in July 2006 to address her heart complaints.

We agree with the district court that the commissioner's determination on the issue is supported by substantial evidence. Pease testified that she went to the emergency room in 2006 because her "heart was beating real fast." She explained that she met with Dr. Brownell and Dr. Brownell advised her to go to the emergency room. Pease testified that her heart symptoms were associated with her work injury because they related to the anxiety she experienced following the accident.

Pease's testimony is supported by medical records submitted at the hearing. Medical records from July 2006 establish that Pease's physicians believed her heart-related symptoms were associated with Dr. Stutts' treatment of her depression. A physician who met with Pease on July 12, 2006, "strongly" recommended she follow up with Dr. Stutts because he "felt that some of [Pease's] orthostatic changes may [have been] due to her multiple medications." Similarly, on July 16, 2006, Pease was evaluated for difficulty breathing and chest discomfort. The physician's assessment of Pease stated that Pease suffered "[p]ersistent waking tachycardia, likely anxiety reaction." Pease was again advised to make an appointment with Dr. Stutts, who was treating Pease for what the commissioner determined were work-related problems. On these facts, we decline to disturb the commissioner's findings.

The district court did not address the commissioner's award of medical bills unrelated to Pease's heart symptoms. The District did not file a motion to enlarge or otherwise request the court to address the issue. Thus, the District did not preserve err on its argument related to the remaining medical bills. *See Stammeyer v. Div. of Narcotics Enforcement*, 721 N.W.2d 541, 548 (Iowa 2006).

### V. Conclusion.

For the reasons discussed above, we conclude the commissioner's findings of fact are supported by substantial evidence. We also conclude the commissioner performed the appropriate standard of review of the deputy commissioner's proposed decision and did not err in assessing Pease's heart-related medical bills against the District. We, therefore, vacate the decision of the court of appeals and affirm the judgment of the district court.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

All justices concur except Mansfield, J., who takes no part.