# IN THE COURT OF APPEALS OF IOWA

No. 15-0287
Filed February 24, 2016

**KRAFT FOODS, INC., and**
**INDEMNITY INSURANCE CO., N.A.,**
    Petitioners-Appellants,

**vs.**

**YUSUF SHARIFF,**
    Respondent-Appellee.

_____

Appeal from the Iowa District Court for Polk County, Richard G. Blane II, Judge.

An employer challenges a judicial-review decision affirming the workers' compensation commissioner's grant of temporary disability benefits and alternate medical care to the claimant. **AFFIRMED.**

Peter J. Thill and Jordan A. Kaplan of Betty, Neuman & McMahon, P.L.C., Davenport, for appellants.

William J. Bribriesco, Anthony J. Bribriesco, and Andrew W. Bribriesco of William J. Bribriesco & Associates, Bettendorf, for appellee.

Considered by Potterfield, P.J., and Doyle and Tabor, JJ. Blane, S.J., takes no part.

**TABOR, Judge.**

Employer Kraft Foods, Inc., and its insurance company, challenge the award of benefits to Yusuf Shariff for injuries he sustained in a work-related motor vehicle accident. Kraft contends the district court erred in concluding the workers' compensation commissioner's medical-causation finding was supported by substantial evidence under Iowa Code section 17A.19(10)(f)(3) (2013). Kraft emphasizes the commissioner's reversal of the deputy's arbitration decision that discounted Shariff's claims, but found the testimony of the employer's on-site physician to be credible.

Even considering the deputy's veracity determinations, the record viewed as a whole supports the agency's final action. Accordingly, like the district court, we find substantial evidence supporting the commissioner's ruling and affirm.

## I.      Facts and Prior Proceedings

Shariff started working for Kraft in 1999 and held various production positions in the Davenport plant until 2004. That year, he received a promotion to unit safety coordinator, serving as a liaison between workers and management on safety devices, ergonomics, and issues under the Occupational Safety and Health Act (OSHA). Shariff was reappointed to that position every two years until November 2010, when he declined to continue as safety coordinator but agreed to stay on until Kraft found and trained his replacement.

As the unit safety coordinator, on February 23, 2011, Shariff was driving a coworker back from a medical appointment in a Kraft vehicle when they were rear-ended by another vehicle while stopped at a red light. Shariff recalled

striking his head on the steering wheel and momentarily losing consciousness. Shariff complained of pain immediately after the collision, according to the deposition of his passenger, Alejandro Lopez. Lopez considered the accident to be serious because the work vehicle was a total loss.

An ambulance transported Shariff to the hospital, where medical personnel took x-rays of his chest, cervical spine, and left knee, and performed a CT (computed tomography) scan of his head. Dr. Daniel Knight diagnosed Shariff with a head injury and abrasion, cervical sprain, and contusions. Dr. Knight prescribed Motrin and Vicodin and discharged Shariff.

The next day, February 24, Shariff was evaluated by Dr. Rick Garrels, who is board certified in occupational medicine and who provided medical services at the Kraft plant. According to Dr. Garrels's notes, Shariff likely struck his head on the steering wheel and briefly lost consciousness as a result of the collision. After examining Shariff, Dr. Garrels diagnosed him with a closed-head injury, right cervical and shoulder pain, low back pain, and left knee pain. Dr. Garrels recommended Shariff take time off work and treat his injuries with "ice, rest, baclofen, tramadol, and prednisone." Shariff returned to Dr. Garrels four days later with complaints of low back and shoulder pain, headaches, nausea, and dizziness. Dr. Garrels recognized signs of a concussion and recommended imaging studies and physical therapy.

In early March 2011, Shariff saw radiologists for MRI (magnetic resonance imaging) of his brain, cervical, lumbar spine, and right shoulder. The brain and cervical images revealed no abnormal results. Dr. Raymond Harre reviewed the

lower-back images, finding degenerative changes in the discs at L5-S1, L4-5, and L3-4. Dr. Harre detected lumbar facet spondylosis with mild lateral recess stenosis bilaterally at L4-5. Regarding the right shoulder, Dr. Harre diagnosed Shariff with mild acromioclavicular degenerative joint disease, a superior labrum anterior-posterior (SLAP) tear, and a partial thickness tear of the supraspinatus tendon with longitudinal extension.

On March 10, 2011, Shariff reported back to Dr. Garrels, stating his headaches were lessening but he was experiencing some vertigo. Shariff also said his neck and shoulder pain was improving with therapy but pain continued in his low back and left knee. Dr. Garrels gave Shariff a cortisone injection in his right shoulder and released him to work the next day with restrictions. Dr. Garrels also ordered an MRI of Shariff's left knee, which revealed a small bone contusion on the medial femoral condyle.

During late March and early April 2011, Dr. Garrels began to grow impatient and disenchanted with Shariff. On March 24, Shariff told Dr. Garrels he continued to have headaches. Dr. Garrels noted Shariff displayed "quite dramatic" pain behaviors, including some moaning. Dr. Garrels also noted a right shoulder labral tear, neck and low back pain, closed head injury with headaches and dizziness, and a history of left knee meniscectomy. Dr. Garrels changed Shariff's medications and referred him to Dr. John Wright for a neurology evaluation, Dr. Phillip Kent for a neuropsychology evaluation,[1] and Dr. Suleman Hussain for a right-shoulder evaluation. In a later email with nurse

---

[1] Shariff later reported he was offended by Dr. Kent's questions during their initial consultation, so he refused to return for additional services.

case-manager Vickie Kenney, Dr. Garrels wrote he had "lost all respect" for Shariff.

At a March 30 appointment with Dr. Hussain, an orthopedic surgeon, Shariff reported discomfort in his right shoulder that started after the work-related collision. Dr. Hussain's examination revealed weakness of the right shoulder, some reduced range of motion, and pain. After reviewing the imaging, the doctor opined Shariff had a superior labral deformity and signal abnormality, as well as potential rotator cuff deficit, which may include a full thickness longitudinal split. Dr. Hussain recommended a course of physical therapy, and if therapy was not beneficial, he suggested treating Shariff's condition as an acute rotator cuff injury, with arthroscopic intervention.

Following a March 31 consultation, Dr. Wright assessed Shariff with post-traumatic headaches and prescribed the pain reliever Frova. Shariff missed a follow-up appointment with Dr. Wright scheduled for April 18.[2] Upon learning of the missed appointments, Dr. Garrels wrote to nurse Kenney: "Obviously, he's going to miss every [appointment] scheduled. He is trying to create the perception that he has memory loss. . . . I am not surprised at the extreme nature of his manipulation."

Meanwhile, in late March 2011, Kraft moved Shariff to the graveyard shift in the sanitation department. Shariff testified he remained on pain medication at that time and his new schedule caused him to suffer from insomnia. He cited

---

[2] The record shows other instances of Shariff missing medical appointments scheduled during this time period.

those circumstances as the reason for missing some of his medical appointments.

Shariff participated in physical therapy for his shoulder two to three times a week during April 2011. The company physical therapist reported Shariff was motivated and had improved his strength but still experienced discomfort when attempting a full range of motion. During a follow-up orthopedic appointment on April 27, Dr. Hussain found Shariff had a symptomatic rotator-cuff tear, along with potential biceps pathology and acromioclavicular arthrosis and recommended surgery. Shariff consented to the surgery, and the claims administrator approved the surgical procedure. On the date of Shariff's appointment, the case manager memorialized her conversation with Dr. Hussain, stating Dr. Hussain agreed Shariff's rotator-cuff tear looked "fresh" and was related to the car accident.

Shariff returned to Dr. Garrels on May 2, complaining back and knee pain. Dr. Garrels expressed skepticism concerning Shariff's motivations and "assessed back and knee pain of an unclear etiology, right shoulder pain, and headaches of an unclear etiology." Dr. Garrels noted he was going to "wait and see" if Shariff changed his mind about "neuropsych testing, if he does not then I will probably not consider the headache work related . . . he could just be making up all of the symptoms."

Two days later, Dr. Garrels took the initiative to call Dr. Hussain to discuss "causation issues" in Shariff's workers' compensation case. Dr. Garrels left an impression with Dr. Hussain that Dr. Garrels believed Shariff was malingering. Also on May 4, 2011, Dr. Garrels sent Dr. Hussain a follow-up letter thanking him

for discussing their "mutual patient." Dr. Garrels wrote: "As you are aware, he was involved in a motor vehicle accident about two months ago, along with another co-worker. He's had numerous reports of injury from the rear-end MVA, while the co-worker had no subsequent injuries." Dr. Garrels asserted both he and the company's physical therapist had evaluated Shariff without detecting any "acute shoulder findings." Dr. Garrels then asked Dr. Hussain whether, based on Dr. Hussain's clinical exam and the MRI, Dr. Hussain believed Shariff's shoulder condition was acute and caused by the accident or chronic and preexisting.

Dr. Hussain responded that Shariff's imaging and his own physical-exam findings were consistent with a chronic, longstanding rotator-cuff-impingement problem likely present prior to the accident. But Dr. Hussain added that he believed Shariff's condition likely resulted from exacerbation of his preexisting impingement pathology. Dr. Garrels responded with an email on May 14, 2011, in which Dr. Garrels expressed his opinion that Shariff was "attempting to have Work Comp pick up all of his chronic health issues." Dr. Garrels then wrote:

> In your answer to it being a chronic condition you used the word exacerbation. That terminology would tie the active treatment to the MVA. I was under the assumption from our conversation that his current state could just be explained by the underlying chronic degenerative state. If this is the case, could you resend the letter with clarification.

On that same day, Dr. Hussain sent a revised letter to Dr. Garrels, removing any reference to exacerbation of a preexisting condition. On May 16, 2011, Dr. Garrels called Shariff to express his "final opinion" that Shariff had reached maximum medical improvement (MMI) from the motor vehicle accident. In his note memorializing the conversation, Dr. Garrels also recounted his

interaction with Dr. Hussain, saying Dr. Hussain "concurred that the shoulder pathology is degenerative in nature." In closing, Dr. Garrels noted: "I let [Shariff] know that for me to remain involved in the care of an individual felt to be malingering would be to perpetuate Workers' Comp fraud which I had no desire."

Shariff filed a workers' compensation claim in May 2011.

In July 2011 Dr. David Field conducted an independent medical examination of Shariff. After reviewing MRI results and physician assessments, Dr. Field opined it was "very likely" Shariff sustained an injury to his right shoulder in the February motor vehicle accident. Dr. Field found it difficult to determine if the collision resulted in a new injury to Shariff's rotator cuff or if the condition preexisted the accident, but in his opinion, the collision was at least a contributing factor to Shariff's development of pain. In Dr. Field's words, the work-related collision "certainly aggravated, flared up, or 'lit up' Shariff's right shoulder problems." At the request of Kraft's counsel, Dr. Garrels responded, stating Dr. Fields only observed Shariff at a single visit and was unable to "appreciate the fact the shoulder never exhibited any objective examination findings which represent an acute injury."

On August 31, 2011, Dr. Hussain wrote a letter expressing his belief neither he nor Dr. Field could properly evaluate the cause of Shariff's complaints because both of them only observed the right shoulder. Dr. Hussain indicated the person in the best position to opine as to causation would be Dr. Garrels, and Dr. Hussain deferred to Dr. Garrels's opinion because Dr. Garrels had the opportunity to examine Shariff's condition "from the beginning."

Shariff's attorney arranged for another IME on October 19, 2011, this time with Dr. Robin Epp. She diagnosed Shariff with the following conditions:

1. Right shoulder pain with MRI arthrogram with evidence of a SLAP tear in the superior labrum and a partial thickness tear of the supraspinatus.
2. Left knee pain after trauma.
3. Neck pain.
4. Bilateral SI joint pain and low back pain.
5. Post-traumatic headaches.

In Dr. Epp's opinion, Shariff's MRI abnormalities, his current symptoms, and his need for shoulder surgery were all causally related to the February 2011 work-related collision.

Kraft then hired Dr. William Boulden to perform a review of Shariff's medical records. In Dr. Boulden's view, the MRI revealed a mild superior labral tear or, perhaps, an abnormality of a small cleft, but not a full tear. Dr. Boulden opined Shariff's shoulder symptoms may have been caused by the work accident but questioned whether the accident caused the SLAP tear and also opined Shariff did not need shoulder surgery. Later, Dr. Boulden performed an IME of Shariff, who initially refused to cooperate and had to be ordered by the agency to participate. Dr. Boulden believed Shariff was professing more pain and dysfunction of his shoulder than indicated by the MRI. Dr. Boulden reiterated his belief shoulder surgery would result in a "very poor" outcome. He also did not believe the collision "caused the pathological findings" in Shariff's shoulder. In his deposition testimony, Dr. Bolden acknowledged he did not see any medical records showing Shariff's shoulder was symptomatic before the accident. Dr.

Bolden also agreed it was more likely than not that the accident caused Shariff's pain symptoms.

Finally, Shariff's attorney arranged for another IME with board-certified neurosurgeon Dr. Robert Milas. After hearing Shariff's description of the accident and examining him, Dr. Milas opined Shariff's headaches, as well as the condition of his lumbar spine, cervical spine, and right shoulder, were a direct result of the collision.

A deputy workers' compensation commissioner held a hearing on February 13, 2012, taking live testimony from Shariff and Dr. Garrels. In her thirty-six-page arbitration decision issued on July 31, 2013, the deputy concluded Shariff "failed to prove by a preponderance of the evidence that his ongoing shoulder complaints were a result of the work injury" and also failed to prove he sustained permanent disability as a result of the collision. The deputy likewise rejected Shariff's claim for an award of alternate medical care. Shariff filed an intra-agency appeal. The commissioner issued a thirty-five-page appeal decision, reversing the deputy and ordering Kraft to pay temporary disability benefits. The commissioner also held the employer liable for alternative medical care, specifically ordering "Dr. Garrels no longer to participate in the care of claimant as the relationship between claimant and Dr. Garrels is irreparably broken and would not likely result in a healthy doctor-client relationship."

Kraft petitioned for judicial review. The district court found substantial evidence to support the commissioner's findings regarding causation and upheld

the benefit award. Kraft now appeals from the district court's order on judicial review.

## II. Standard of Review and Foundational Principles

In appeals from a district court's judicial-review order, the question is whether we reach the same decision as the district court when we apply Iowa Code chapter 17A, the Iowa Administrative Procedure Act (IAPA). *Staff Mgmt. v. Jimenez*, 839 N.W.2d 640, 653-54 (Iowa 2013). If we reach the same conclusion, we affirm; if we reach a different conclusion, we reverse. *Westling v. Hormel Foods Corp.*, 810 N.W.2d 247, 251 (Iowa 2012).

Both our court and the district court review final agency action. *See Iowa State Fairgrounds Sec. v. Iowa Civ. Rights Comm'n*, 322 N.W.2d 293, 294 (Iowa 1982) (interpreting prior version of IAPA and noting that upon "judicial review, the district court reviews the final agency decision, not the hearing officer's proposal"). If the agency decision runs afoul of any of the grounds listed in section 17A.19(10) and the person seeking relief can show prejudice, the district court may reverse or modify the agency's decision. *Id.*

Among the grounds for relief on judicial review is the absence of "substantial evidence" to support the commissioner's factual determinations when the agency record is viewed as a whole. Iowa Code § 17A.19(10)(f). Evidence is "substantial" if its quantity and quality "would be deemed sufficient by a neutral, detached, and reasonable person, to establish the fact at issue when the consequences resulting from the establishment of that fact are understood to be serious and of great importance." *Id.* § 17A.19(10)(f)(1).

Particularly pertinent to the challenge before us is the legislature's definition of the phrase "when that record is viewed as a whole," which provides:

> [T]he adequacy of the evidence in the record before the court to support a particular finding of fact must be judged in light of all the relevant evidence in the record cited by any party that detracts from that finding as well as all of the relevant evidence in the record cited by any party that supports it, including *any determinations of veracity by the presiding officer who personally observed the demeanor of the witnesses* and the agency's explanation of why the relevant evidence in the record supports its material findings of fact.

*Id.* § 17A.19(10)(f)(3) (emphasis added).

The "presiding officer" is the deputy commissioner who conducts the arbitration hearing. *See Neal v. Annett Holdings, Inc.*, 814 N.W.2d 512, 532 (Iowa 2012) (Mansfield, J., dissenting) (quoting *State Fairgrounds*, 322 N.W.2d at 295, for the proposition that a disagreement on the facts between the deputy and the commissioner may "affect the substantiality of the evidence supporting" the final agency action).

According to the definition at section 17A.19(10)(f)(3), when we assess whether substantial evidence supports the agency decision, we "consider the credibility determination by the presiding officer who had a chance to observe the demeanor of the witnesses. When analyzing the deputy's credibility determination, we look at the facts relied upon by the expert and circumstances contained in the record." *Jimenez*, 839 N.W.2d at 654.

If the evidence before the agency is open to a fair difference of opinion, we must find substantial evidence supports the commissioner's decision. *Id.* We

will not consider evidence insubstantial merely because we may draw different conclusions from the record than the commissioner drew. *Id.*

Generally, causation questions fall into the exclusive domain of medical experts. *See Cedar Rapids Cmty. Sch. Dist. v. Pease*, 807 N.W.2d 839, 845 (Iowa 2011). The commissioner may reject expert opinion, in whole or in part, particularly when there is competing testimony. *Id.* at 845, 850. A reviewing court may not accept the competing expert's opinions as a means to reverse the commissioner's findings of fact on medical causation. *Id.* at 850 (stating we accord deference to the commissioner on the issue of medical causation because that issue presents "a question of fact that is vested in the [commissioner's] discretion").

## III. Analysis

Kraft describes its challenge to the commissioner's decision as a review for substantial evidence, "but with a twist." The twist is the commissioner's rejection of the deputy's determinations concerning the veracity of claimant Shariff and Kraft's company doctor, Rick Garrels. The employer asks us to reverse the final agency action because the commissioner's decision was not supported by substantial evidence in the record viewed as a whole as envisioned by section 17A.19(10)(f)(3).

### A. Observations of demeanor

Kraft is correct that when deciding if the agency action stems from factual findings not supported by substantial evidence, the court's assessment of the adequacy of the evidence must include consideration of the deputy's

determinations of veracity based on his or her personal observation of witness demeanor at the arbitration hearing.  *See* Iowa Code § 17A.19(10)(f)(3).  But section 17A.19(10)(f)(3) does not require this court to accord weight to a deputy's veracity determinations when the deputy's determinations are not based on his or her personal observations of demeanor evidence.  The commissioner is generally free to reweigh the evidence in the agency record.  *See* id. § 17A.15(2) (allowing fact findings to be prepared by someone other than person who presided at reception of evidence "unless demeanor of witnesses is a substantial factor"); *see also Trade Prof'ls, Inc. v. Shriver*, 661 N.W.2d 119, 125 (Iowa 2003).

In rejecting Shariff's compensation claim, the deputy offered a critique of the claimant's credibility.  But her concerns did not stem from watching his demeanor and listening to his delivery on the witness stand.  The deputy opined:

> At the time of evidentiary hearing, claimant provided knowledgeable testimony, delivered in a clear manner. Claimant's physical presentation was consistent with his reported ongoing complaints. However, upon review of the remainder of the evidentiary record, the undersigned is given some pause as to the weight to be properly provided to claimant's testimony and subjective reports of pain.

The deputy concluded Shariff's "personal feelings" about the handling of his workers' compensation claim drew his "credibility into question."  She stated: "While I believe claimant may wholeheartedly believe what he asserts, I find little support for his assertions outside of claimant's own testimony.  Therefore, while claimant was a pleasant man at the time of evidentiary hearing, the undersigned is unable to find his testimony credible."

The deputy's determination Shariff lacked credibility was not anchored in her observations of him. In fact, all of the deputy's comments about Shariff's live testimony were favorable to Shariff. She described him as "knowledgeable" and "clear" and deemed his appearance to be consistent with his complaints. The deputy also found him to be "pleasant" and sincere in his own assertions. The deputy questioned the weight to give Shariff's testimony only "upon review of the remainder of the evidentiary record."

In declining to adopt the deputy's findings in the intra-agency appeal, the commissioner wrote:

> [T]he presiding deputy simply stated that she believes claimant believes what he asserts, but she found little support for his assertions outside of his own testimony. Such credibility assessment of the deputy is based upon her review of the medical records and not upon her personal observations of claimant or his demeanor at the hearing.

We agree with the commissioner's reasoning. Because Shariff's demeanor was not a substantial factor in the deputy's determination, we, like the district court, are not troubled by the commissioner's divergent fact findings on this point.

We also consider the deputy's determination Dr. Garrels was a credible witness. Much of the deputy's reliance on Dr. Garrels's opinions stemmed from the deputy's review of medical records and not her observation of his demeanor at the arbitration hearing. For example, the deputy found because Dr. Garrels acted as Shariff's authorized physician throughout the course of treatment, his opinion was entitled to greater weight than the one-time evaluation by Dr. Epp. The commissioner was entitled to and did rebuff that conclusion, noting our

supreme court has rejected the notion that, as a matter of law, a treating physician's view will be given more weight than a physician who examines the patient in anticipation of litigation, citing *Gilleland v. Armstrong Rubber Co.*, 524 N.W.2d 404, 408 (Iowa 1994).

It is true the deputy also stated: "Observation of Dr. Garrels at the time of evidentiary hearing and in the limited deposition testimony video provided for review[3] gives the undersigned no pause regarding the veracity of Dr. Garrels's testimony." The deputy did not mention any specific aspects of his demeanor, but to the extent the deputy's veracity determination concerning Dr. Garrels was based on her personal observations of him at the hearing, we will consider that determination as part of our substantial-evidence review. *See* Iowa Code § 17A.19(10)(f)(3). We likewise consider the commissioner's "explanation of why the relevant evidence in the record supports its material findings of fact." *See id.*

### B. Substantial-evidence review

Upon de novo review of the record, the commissioner offered the following four-point rationale for finding Shariff had proved his medical conditions were caused by the February 2011 work-related accident.

---

[3] The deputy received a video exhibit prepared by Shariff's counsel that juxtaposed deposition clips of Dr. Garrels and Dr. Hussain with textual statements regarding claimant's position. The deputy decided to give that exhibit "negligible weight" because she believed the clips were taken out of context. The only weight the deputy gave the exhibit related to her observation of the doctors' demeanor during the video depositions. Because the same exhibit was available to the commissioner, he was equally able to make credibility determinations based on the doctors' demeanors while being deposed. *See generally Macaulay v. Wachovia Bank*, 569 S.E.2d 371, 376 (S.C. Ct. App. 2002) (finding appellate court was placed in "equal position to judge [witness's] credibility" when testimony was through video deposition).

First, claimant's assertions that he had no chronic headaches and no back, neck, chronic left knee, and right shoulder pain before the stipulated injury in this case is unrebutted. . . . [T]here is no evidence in this record that claimant had any symptoms involving those areas before the stipulated injury. If such conditions had existed, they did not require restrictions as to claimant's functional ability and did not require ongoing medical care. Dr. Garrels' opinions as to claimant's pre-injury baseline of function border on fictitious.

Second, claimant has exhibited chronic complaints of headaches, low back, left knee, and right shoulder pain since the motor vehicle accident. No physician in this case, other than Dr. Garrels, suggests that these complaints are false or unreal. . . . Neither Dr. Garrels nor Dr. Hussain has explained satisfactorily how they arrived at the opinion that this ongoing and chronic pain somehow was transformed into a non-work related condition shortly after Dr. Hussain recommended surgery for what he termed as an exacerbation of claimant's prior shoulder condition. Claimant clearly has not returned to this figurative baseline . . . . The suggestion to diminish the work injury of claimant that this accident was minor defies logic after a simple review of the accident photos—not even defendants are asserting that claimant's initial pain was not caused by the accident.

Third, although Dr. Hussain has refused to provide a causation opinion other than deferring to Dr. Garrels, four other board certified physicians, Drs. Field, Milas, Boulden, and Epp, sufficiently agree that the motor vehicle accident caused claimant's current pain. These physicians simply disagree as to course of future treatment options. Even Dr. Hussain continues to believe the pain warrants surgery, he merely defers to Dr. Garrels as to the cause of the ongoing pain.

Finally, following a review of the entire record in this contested case, it is found that in this particular case, Dr. Garrels' views lack objectivity.

The commissioner discussed in detail Dr. Garrels's hostility toward Shariff, which we find well-documented in the agency record. Noting Dr. Garrels has a "significant and professional history of providing objective medical opinions before the division," the commissioner sharply rebuked Dr. Garrels's conduct in persuading Dr. Hussain to alter his opinion "in this particular case":

It must also be noted that this contested appeal is quite likely the first time where it has been clearly proven that an occupational medicine doctor actually lobbied a medical specialist to change his opinion in a manner favorable to an employer and thus directly interfere with the specialist's recommended and authorized treatment of the work injury, which had been voluntarily accepted by the employer and insurer. . . . In a workers' compensation context, such advocacy is permissible by a physician employed for that purpose by an employer or insurer, but this is not . . . permissible for a physician employed to treat a work injury under the Iowa Code.[4]

On appeal, Kraft contends the commissioner's rationale is not supported by substantial evidence because it rests too heavily on Shariff's subjective pain complaints and the rejection of Dr. Garrels's testimony on a "cold record."

The temperature of the record does not matter here. This contested case does not rise or fall on the demeanor of the live witnesses. The question here is medical causation. The commissioner, as the fact finder, determines the weight to give expert opinions on that issue. *See Sherman v. Pella Corp.*, 576 N.W.2d 312, 321 (Iowa 1998). Giving credence to the opinions expressed by Dr. Field, Dr. Milas, Dr. Epp, and even Dr. Boulden, following their IMEs, the commissioner found the February 2011 work injury was the cause of Shariff's headaches, as well as his neck, back, and shoulder conditions. As a reviewing court, we are not in a position to find that Dr. Garrels's contrary view "trumps" the other medical causation evidence cited by the commissioner—even if we consider the deputy's determination that Dr. Garrels's demeanor during his testimony did not raise red

---

[4] After criticizing "the objectivity of Dr. Garrels," the commissioner also found "claimant has not shown an ideal level [of] respect for his engagement with the workers' compensation system and obtaining his own medical treatment commensurate with his assertions of ongoing pain." The commissioner found it "difficult to discern" the level of claimant's disrespect resulting "from his perception of hostility from Dr. Garrels and what level was attempting to control his outcome."

flags concerning his veracity. *See Jimenez*, 839 N.W.2d at 654 (stating if the evidence before the agency is open to a fair difference of opinion, a reviewing court must find substantial evidence supports the commissioner's decision).

We find substantial evidence in the record to support the commissioner's decision. Accordingly, we affirm the award of temporary disability benefits and alternative medical care.

**AFFIRMED.**