**IN THE COURT OF APPEALS OF IOWA**

No. 14-1755
Filed September 10, 2015

**KEY CITY TRANSPORT, INC., and
GREAT WEST CASUALTY COMPANY**
       Petitioners-Appellees/Cross Appellants,

**vs.**

**JAMES DELIRE,**
       Respondent-Appellant/Cross-Appellee.
_____

       Appeal from the Iowa District Court for Polk County, Michael D. Huppert, Judge.


       Claimant appeals and the employer cross appeals from the district court's ruling on judicial review of a workers' compensation award. **AFFIRMED ON BOTH APPEALS.**


       Mark J. Sullivan of Reynolds & Kenline, L.L.P., Dubuque, for appellant.

       Joseph M. Barron and Stephen W. Spencer of Peddicord, Wharton, Spencer, Hook, Barron & Wegman, L.L.P., West Des Moines, for appellees.



       Heard by Tabor, P.J., McDonald, J., and Mahan, S.J.*

       *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2015).

**MCDONALD, J.**

Claimant James Delire appeals from the district court's ruling on judicial review of his workers' compensation claim. He contends the district court erred when it overturned the commissioner's weekly rate calculation. On cross-appeal, Key City Transport, Inc., contends the district court erred in affirming the deputy commissioner's findings of fact and conclusions of law regarding medical causation and in affirming the deputy's award of running healing period benefits. We affirm the judgment of the district court.

I.

Key City Transport hired Delire as an over-the-road driver to make long-haul trips from Iowa to California and back. Delire's compensation was determined by mileage plus additional compensation for drop fees. Delire claims he was told at the time of hire by Joe Bitter, Key City's managing partner and one of its owners, that some drivers on that route earned $70,000 to $75,000 per year.

Delire commenced work on May 23, 2008. His first week involved completing paperwork and making several local runs. He earned $257 in mileage and $155 in drop fees. Delire drove to California and back the next week and earned $1254 in mileage and $40 for one drop off. During his third week, Delire drove to California and back and earned $1425 in mileage and $240 in drop fees. During this trip, on June 11, Delire was injured while unloading large windows. One of the windows began to tip over and Delire tried to catch it with his right arm. He fell on his back and felt a sharp pain in his right shoulder and right armpit. He called Bitter to report the injury. Delire was told to pick up

a trailer and head back to Dubuque. He had to stop frequently en route because of the pain.

Upon returning home, Delire sought medical treatment for the injury. Delire treated with Dr. Setter, a chiropractor. Dr. Setter diagnosed the injury as a severe right shoulder sprain and cervical and thoracic sprains. Dr. Setter ordered an MRI of the shoulder and a thoracic x-ray. The MRI showed supraspinatus tendinosis and degenerative changes in the acromioclavicular ("AC") joint. He was given temporary work restrictions that did not allow him to continue work at that time. Dr. Setter referred Delire to an occupational medicine physician, Dr. Garrity, who confirmed Dr. Setter's diagnosis of a right shoulder sprain. Dr. Garrity lessened the work restrictions, allowing Delire to do some driving but without loading and unloading. Dr. Garrity referred Delire to Dr. Ott, an orthopedic surgeon. However, Ms. Thompson, the workers' compensation nurse case manager, canceled the appointment and made one with Dr. Mendel. Dr. Mendel diagnosed Delire with a possible slap lesion with a labral injury or impingement. Dr. Mendel proposed arthroscopic surgery. Delire agreed to the surgery, which was performed in February 2009.

Delire did not experience immediate relief following surgery. Instead, he began to experience muscle spasms, shooting pain in his right arm, and clawing of the right hand. Despite physical therapy, Delire continued to experience symptoms. Dr. Mendel restricted Delire from work. Following additional treatment and therapy, Dr. Mendel recommended a second shoulder surgery, which he performed in February 2010. Dr. Mendel also performed a right carpal tunnel release, a right cubital tunnel release, a right arthroscopic glenohumeral joint and labral debridement and synovectomy, a right

shoulder bio-tenodesis, and another subacromial decompression. These procedures initially provided modest relief to Delire. He began physical therapy again. Delire was restricted from work at this time. Delire met with Dr. Mendel in August 2010. At the workers' compensation hearing, the details of this examination were in dispute. Dr. Mendel noticed Delire had clawing of his right hand. According to Delire, Dr. Mendel was concerned about Delire's persistent symptoms, was uncomfortable releasing him at maximum medical improvement ("MMI"), and wanted to perform another EMG and possibly another MRI. The case manager confronted Dr. Mendel and stated the appointment was for MMI. Ultimately, Dr. Mendel opined Delire had reached MMI and released him without any work restrictions.

Subsequently, Delire informed Bitter of his release to work but expressed concern he was still unable to drive to California. In response, Key City initially provided Delire with short trips not requiring loading or unloading. Eventually, Key City provided Delire with longer trips, including overnights. Delire began to experience pain in his left shoulder from overcompensation. In June of 2011, Delire was told to make a ten-hour trip to Michigan. Delire became upset and emotional. Bitter told Delire to come back only when he had a letter from a mental health professional opining he was able to drive. Delire attempted to obtain mental health treatment, but the workers' compensation carrier did not approve the sought-after treatment. Key City had also cancelled Delire's health insurance. Delire never performed any work for Key City after this time.

On June 26, 2011, Delire filed his arbitration petition for the injury occurring in 2008. On February 12, 2012, Delire filed a petition for alternate care and requested

another appointment with Dr. Mendel. Delire's attorney requested that Ms. Thompson not be at this examination. Dr. Mendel recommended another MRI, which revealed a small full-thickness tear of the rotator cuff. Great West, the workers' compensation insurance carrier for Key City, denied the claim as not being work related. Subsequently, Delire was evaluated by Dr. Cullen, a neurologist, who concluded Delire's nerve condition had improved but was not normalized. Delire followed up with Dr. Mendel, who did not recommend surgery at that time. Dr. Mendel noted Delire seemed depressed, and Dr. Mendel recommended a psychiatric evaluation. Key City scheduled a psychiatric independent medical examination ("IME") with Dr. Jennisch. Dr. Jennisch concluded Delire had an adjustment reaction with a combination of depressive and anxious features. He recommended individual counseling, cognitive behavior therapy, and anti-depressant medication. Dr. Jennisch stated Delire's psychiatric symptoms were caused both by his work injury and his relationship troubles. Dr. Jennisch stated Delire's mental health condition likely was not permanent and the prognosis was good. Delire requested Great West authorize mental health treatment, but it was not authorized.

Meanwhile, Delire's claim for workers' compensation benefits progressed. The deputy commissioner issued an arbitration decision in September 2013. The deputy found Delire's left shoulder injury was "a sequela from compensating for the right shoulder injury." The deputy concluded it was not possible to evaluate Delire's industrial disability because it was "highly doubtful claimant has actually reached maximum medical improvement." The deputy awarded running healing period benefits

"until such time as the requirements for termination of healing period benefits are met." Key City appealed.

The appeal decision adopted the arbitration decision except the commissioner recalculated Delire's weekly compensation rate. Citing Iowa Code section 85.36(7) (2011), the commissioner explained the record did not contain evidence of any weeks of work representative of Delire's earnings and did not contain any evidence of earnings of other employees in a similar position. The commissioner noted Delire's testimony that Bitter told him other similarly-situated drivers earned $70,000 to $75,000. The commissioner concluded:

> This is an extremely fact specific case in which the undersigned must use his expertise and specialized knowledge to evaluate the best available evidence to determine claimant's average weekly wage. Based on the testimony of the parties at the hearing it is concluded that claimant's weekly compensation rate should be based on an annual income of $70,000 which results in an average weekly wage of $1346.15. . . . Therefore, it is concluded that claimant's weekly compensation rate is $748.78. The arbitration decision is therefore amended solely as to the issue of claimant's weekly compensation rate.

Key City petitioned for judicial review, challenging the weekly benefit rate, medical causation, and the award of healing period benefits. Delire filed a cross-petition, challenging the commissioner's determination of the weekly benefit rate. The district court affirmed the agency's findings regarding medical causation and the award of healing period benefits. The district court reversed the agency's calculation of the weekly benefit rate, explaining the process used could not be upheld "as either rational, logical, or justifiable." The court remanded to the agency "to undertake the proper analysis of the facts contained within the record already made in coming to a proper rate calculation." Delire timely appealed, and Key City cross-appealed.

II.

"Iowa Code chapter 17A governs our review of the commissioner's decision. The district court acts in an appellate capacity when reviewing the commissioner's decisions to correct errors of law." *Mike Brooks, Inc. v. House*, 843 N.W.2d 885, 888 (Iowa 2014) (internal citations omitted). "On appeal, we apply the standards of chapter 17A to determine whether we reach the same conclusions as the district court. If we reach the same conclusions, we affirm; otherwise we may reverse." *Id.*

A.

We first address Key City's contention that Delire failed to prove his current medical conditions are causally related to his injury.

> The legislature has by a provision of law vested the commissioner with the discretion to make factual determinations. Medical causation is a question of fact vested in the commissioner's discretion. We are bound by the commissioner's factual determinations if they are supported by substantial evidence in the record before the court when that record is viewed as a whole.

*Id.* at 889. "'Substantial evidence' means the quantity and quality of evidence that would be deemed sufficient by a neutral, detached, and reasonable person, to establish the fact at issue when the consequences resulting from the establishment of that fact are understood to be serious and of great importance." Iowa Code § 17A.19(10)(f)(1). On substantial-evidence review, we do not reassess the evidence or make our own determination of the weight to be given to various pieces of evidence. *See Cedar Rapids Cmty. Sch. Dist. v. Pease*, 807 N.W.2d 839, 849 (Iowa 2011). The question is not whether the evidence would support a different finding; the question is whether the evidence supports the finding actually made. *See Larson Mfg. Co., Inc. v. Thorson*, 763 N.W.2d 842, 850 (Iowa 2009).

Delire asserted several physical conditions and injuries arose out of his work injury. As a general rule, medical causation is the exclusive domain of experts. *See Cedar Rapids Cmty. Sch. Dist.*, 807 N.W.2d at 845. Whether to accept or reject expert opinion evidence regarding medical causation is within the province of the commissioner, who is free to do so in whole or in part, particularly when there is competing testimony. *See id.* at 845, 850. A reviewing court may not accept the competing expert's opinions in an effort to reject the commissioner's findings of fact on medical causation. *See id.* at 850. If we find substantial evidence supports the commissioner's findings, we affirm. *See id.*

Key City first contends that Delire's cervical and thoracic spine injuries were not causally related to his work injury. Key City acknowledges Delire's initial complaint included a diagnosis of cervical and thoracic spine strains but contends the bulk of Delire's medical records make no reference to it. The agency addressed this issue and found causation because Delire was initially found to have a cervical and thoracic strain. The finding was further supported by Dr. Robin Epp, who conducted an independent medical examination, as well as Delire's testimony at the hearing. We do not reweigh the evidence.

Key City next contends Delire's injury to his left arm and shoulder was not related to his work injury. Key City argues there is no mention of any medical condition related to Delire's left side until 2012. It argues Dr. Mendel stated Delire never mentioned any left side pain in the entire time that he treated him. Dr. Mendel does not attribute any left shoulder and arm problems to Delire's right shoulder injury. Key City notes Delire admitted his left shoulder symptoms went away after he quit driving a truck in the

summer of 2011. The agency also considered this issue. It found Delire's medical conditions related to his left side were caused by the work injury because of overcompensation. Dr. Epp's opinion, relied on by the agency, linked these symptoms to the 2008 injury. Thus, the finding is supported by substantial evidence in the record.

Key City also argues Delire's full-thickness rotator cuff tear was not caused by the 2008 injury. Delire quit working for Key City in June 2011. In early 2012, he complained of a return of significant symptoms in his right shoulder. Key City approved him to return to Dr. Mendel. The MRI arthrogram performed by Dr. Mendel showed a full thickness tear in his rotator cuff. The agency found this to be related to the 2008 injury. The district court affirmed, reasoning that Dr. Mendel suspected a rotator cuff injury relatively early in his treatment of Delire. Also, Dr. Epp found Delire's current right shoulder complaints were tied to the work injury. Further, the agency noted there is no medical opinion stating Delire did not have a torn rotator cuff and there is no medical opinion stating the injury was not work-related. Again, the relevant question is not whether the evidence would support a different finding, the relevant question is whether substantial evidence supports the finding actually made. We conclude it does.

Finally, Key City contends Delire's mental health condition is not related to his shoulder injury. There is no doubt Delire suffered from some mental health conditions prior to his injury. Dr. Jennisch noted Delire's adjustment disorder had multifactorial causes including, initially, his 2008 work injury, as well as his relationship problems. Key City argues Dr. Mendel opined the psychological issues were not related to the work injury. However, Dr. Mendel noted this would be better determined by a psychiatrist. Dr. Jennisch opined that Delire's condition had gotten better and was not

permanent, but the consequences of his 2008 injury—eventual unemployment, financial stress, chronic pain, problems with access to medical care, and worsening relationship problems—were "significant contributing factors to his ongoing psychiatric symptomology." The agency relied on Dr. Jennisch's determination that Delire's work injury was a substantial factor in causing Delire's mental health condition. Substantial evidence ties Delire's psychological condition to the work injury.

B.

We next address the award of healing period benefits. "Healing period compensation is a description given to temporary workers' compensation weekly benefits that precede an allowance of permanent partial disability benefits." *Pitzer v. Rowley Interstate*, 507 N.W.2d 389, 393 n.1 (Iowa 1993). Healing period benefits are payable to an injured worker who has suffered permanent partial disability until the worker has returned to work, the worker has reached MMI, or the worker is medically capable of returning to employment substantially similar to the employment in which the employee was engaged at the time of the injury. *See* Iowa Code § 85.34; *see also Armstrong Tire & Rubber Co. v. Kubli*, 312 N.W.2d 60, 65 (Iowa Ct. App. 1981). Healing periods can be intermittent and can restart. *Waldinger Corp. v. Mettler*, 817 N.W.2d 1, 10-11 (Iowa 2012). Further, "an anticipated improvement in continuing pain or depression, if medically indicated, may extend the length of the healing period if a substantial change in industrial disability is also expected to result." *Pitzer*, 507 N.W.2d at 392.

The agency awarded Delire healing period benefits for several periods, including running healing period benefits from and after June 15, 2011. The agency made the

award based on several considerations. First, Delire did not successfully return to work. His routes were limited in distance. He did not perform loading and unloading. His employer precluded him from driving without a release from a mental health professional. Second, the agency found that, despite Dr. Mendel's opinion Delire had reached MMI, Delire had not in fact reached MMI. The agency found Delire had physical and mental health conditions untreated and relevant to an industrial disability determination. Also in support of this finding, the agency found Dr. Mendel was pressured to opine Delire had reached MMI. While we understand Key City and Dr. Mendel strongly dispute the issue, that credibility determination is best left to the agency. *See Arndt v. City of Le Claire*, 728 N.W.2d 389, 394 (Iowa 2007). We conclude the agency's findings on this issue are supported by substantial evidence and its application of the facts to the law was not irrational, illogical, or wholly unjustifiable. *See Jacobson Transp. Co. v. Harris*, 778 N.W.2d 192, 196 (Iowa 2010); *Dunlap v. Action Warehouse*, 824 N.W.2d 545, 557 (Iowa Ct. App. 2012) (finding substantial evidence that claimant had "not truly returned to work, and . . . had not achieved maximum medical improvement" where the employee was returned to work by doctor but was essentially working while injured).

## C.

We next address the calculation of Delire's earnings. Section 85.36 provides as follows:

> Weekly earnings means gross salary, wages, or earnings of an employee to which such employee would have been entitled had the employee worked the customary hours for the full pay period in which the employee was injured, as regularly required by the employee's employer for the work or employment for which the employee was employed, computed or determined as follows and then rounded to the nearest dollar:

. . . .

      6. In the case of an employee who is paid on a daily or hourly basis, or by the output of the employee, the weekly earnings shall be computed by dividing by thirteen the earnings, including shift differential pay but not including overtime or premium pay, of the employee earned in the employ of the employer in the last completed period of thirteen consecutive calendar weeks immediately preceding the injury. . . . A week which does not fairly reflect the employee's customary earnings shall be replaced by the closest previous week with earnings that fairly represent the employee's customary earnings.

Delire had been employed less than three weeks at the time of his injury. Subsection (7) provides the method to calculate weekly earnings for employees employed fewer than thirteen weeks at the time of injury:

      7. In the case of an employee who has been in the employ of the employer less than thirteen calendar weeks immediately preceding the injury, the employee's weekly earnings shall be computed under subsection 6, taking the earnings, including shift differential pay but not including overtime or premium pay, for such purpose to be the amount the employee would have earned had the employee been so employed by the employer the full thirteen calendar weeks immediately preceding the injury and had worked, when work was available to other employees in a similar occupation. If the earnings of other employees cannot be determined, the employee's weekly earnings shall be the average computed for the number of weeks the employee has been in the employ of the employer.

The record does not contain any evidence of the earnings of "other employees in a similar occupation." Nor does it contain evidence of any representative week "had the employee worked the customary hours for the full pay period in which the employee was injured, as regularly required by the employee's employer for the work or employment for which the employee was employed." Not having evidence on these issues, the commissioner determined Delire's weekly earnings based on his experience. The district court observed, "nowhere in the appeal decision does the commissioner identify what part of his experience or knowledge he was relying upon to assist him in the evaluation of the evidence in this regard, nor does he provide anything resembling

an evaluation of the evidence." The district court concluded the commissioner did not provide an analytical process that can be followed on judicial review. *See Burton v. Hilltop Care Ctr.*, 813 N.W.2d 250, 260 (Iowa 2012) ("[W]e have held the commissioner's duty to furnish a reasoned opinion is satisfied if it is possible to work backward . . . and to deduce what must have been [the agency's] legal conclusions and [its] findings of fact." (citations and internal quotation marks omitted)). The district court remanded to the commissioner "to undertake the proper analysis of the facts contained within the record already made in coming to a proper rate calculation."

Our conclusion on this issue is the same as the district court's. The commissioner's use of hypothetical annual earnings to obtain weekly earnings cannot be upheld as rational, logical, or justifiable when the acceptable methods of determining Delire's weekly earnings are set forth by statute. We therefore affirm the district court's decision to remand the calculation to the agency. *See Mike Brooks, Inc.*, 843 N.W.2d at 888; *Schutjer v. Algona Manor Care Center*, 780 N.W. 2d 549, 552 (Iowa 2010) (affirming district court order remanding matter to commissioner for calculation of weekly earnings pursuant to statutory directive); *Hanigan v. Hedstrom Concrete Prods., Inc.*, 524 N.W.2d 158, 160 (Iowa 1994) (affirming commissioner's calculation of weekly earnings by averaging wages actually earned by truck driver employed fewer than thirteen weeks and stating "[t]his claimant did not produce evidence of what a truly similar employee would have earned" and'[i]n view of the lack of evidence on that matter, it would be difficult to formulate a fairer test for a wage basis than to average the wages actually received by the employee").

III.

For the foregoing reasons, we affirm the district court on the appeal and cross-appeal.

**AFFIRMED ON BOTH APPEALS.**