# IN THE COURT OF APPEALS OF IOWA

No. 20-0986
Filed June 16, 2021

**SHERILYN FASIG SNITKER,**
    Plaintiff-Appellant,

**vs.**

**SEABRIGHT INSURANCE COMPANY, and BIRDNOW ENTERPRISES, INC. d/b/a BIRDNOW MOTORS,**
    Defendants-Appellees.

_____

Appeal from the Iowa District Court for Polk County, Lawrence P. McLellan, Judge.

Sherilyn Fasig Snitker appeals the district court ruling on judicial review upholding a workers' compensation benefits award. **AFFIRMED.**

Laura Schultes of RSH Legal, P.C., Cedar Rapids, for appellant.

Michael R. Faz and L. Tyler Laflin of Engles, Ketcham, Olson & Keith, P.C., Omaha, Nebraska, for appellees.

Considered by Bower, C.J., and Doyle and Mullins, JJ.

**BOWER, Chief Judge.**

Sherilyn Fasig Snitker appeals the district court's ruling on judicial review upholding the workers' compensation commissioner's determination she suffered forty-percent industrial disability rather than total disability. We affirm.

On February 8, 2013, Snitker was working as a sales consultant for Birdnow Enterprises, Inc. doing business as Birdnow Motors, when she fell twice on ice while moving vehicles in the lot. After the second fall, she felt pain in her back and left work. The employer and its insurer (collectively "Birdnow") acknowledge Snitker suffered a work-related injury and paid workers' compensation benefits while Snitker obtained medical care for her pain symptoms, including physical therapy, medication management, injections, radio frequency ablation, and eventually a lumbar laminectomy and fusion on July 9, 2014. Snitker worked part-time as recommended by medical providers but eventually ceased working for Birdnow. All parties acknowledge Snitker has suffered some industrial disability, the disagreement is about the extent of that disability.

Whether Snitker suffered a forty-percent industrial disability is a mixed question of law and fact. *See Neal v. Annett Holdings, Inc.*, 814 N.W.2d 512, 525 (Iowa 2012). We review the commissioner's findings of fact for substantial evidence and "engage in a 'fairly intensive review of the record to ensure that the fact finding is itself reasonable.'" *Id.* (citation omitted). But "in considering findings of industrial disability, we recognize the commissioner is routinely called upon to make such assessments and has a special expertise in the area that is entitled to respect by a reviewing court." *Id.* at 527. When a party challenges the commissioner's application of law to facts, we will not reverse the commissioner's

decision unless it is "irrational, illogical, or wholly unjustifiable." *Larson Mfg. Co. v. Thorson*, 763 N.W.2d 842, 857 (Iowa 2009).

> An employee who suffers a "permanent disability" is entitled to compensation. The amount of compensation for an unscheduled injury resulting in permanent partial disability is based on the employee's earning capacity. Earning capacity is determined by an evaluation of several factors, including "functional disability . . . age, education, qualifications, experience, and inability to engage in similar employment." Personal characteristics of the employee that affect employability may be considered. In determining industrial disability, the commissioner "is not required to fix disability with precise accuracy."

*Neal*, 814 N.W.2d at 526 (citations omitted).

Snitker was seen by Timothy Miller, M.D., on May 22, 2014, and again on December 1, following the laminectomy surgery. Dr. Miller stated Snitker appeared to have a good response to the surgery with marked improvement in radicular function. She had no residual pain in the lower extremity. He recommended some changes to her prescribed medications. Dr. Miller found Snitker had reached maximum medical improvement (MMI). While he agreed Snitker had ongoing back problems, he did not believe there was clear indication her sacroiliitis was directly related to her fall at work. As a result of the injury and ongoing impairment, he assessed a twenty-one percent whole person impairment but did not feel the need to impose any permanent restrictions. After a course of physical therapy, Snitker was again evaluated by Dr. Miller on February 4, 2015. He noted Snitker had made substantial progress.

On April 22, 2015, Snitker participated in a functional capacity evaluation (FCE) with E3 Work Therapy Services. The evaluation was deemed valid, and based on the results, Snitker was placed in the light duty job category.

On May 11, Dr. Miller wrote: "After reviewing the recommended FCE, while patient during testing showed material handling of only approximately [twenty-five] pounds, I do not believe within a reasonable degree of medical certainty that she requires any restrictions in her present job based on previous evaluation."

On September 30, Snitker was evaluated by Maruti Kari, M.D., for chronic back pain. Dr. Kari recommended a series of caudal epidural lysis of adhesion procedures followed by one or two sacroiliac joint injections on the right. Snitker saw Dr. Kari again on November 11 and December 16 for improved but continuing pain. On January 18, 2016, Dr. Kari re-evaluated Snitker following further treatment. Snitker then rated her pain at six of ten. She was diagnosed with lumbar radiculopathy, sacroiliitis, and post laminectomy pain syndrome.[1]

Snitker participated in an independent medical examination (IME) with Dr. Robin Sassman on May 17, 2016. Dr. Sassman conducted a records review and physical examination and made no finding Snitker was malingering or exaggerating her symptoms. Based on Snitker's report she had suffered no previous low back symptoms or low back injury, Dr. Sassman concluded the current pain, loss of range of motion, and course of treatment were the result of an aggravation of underlying degenerative disease. Dr. Sassman did not find Snitker at MMI but instead recommended she seek out further opinions regarding whether another surgical repair would be useful. Based on her reduced range of motion, Dr. Sassman assessed a twenty-eight percent whole person impairment.

---

[1] Dr. Kari also noted Snitker was involved in a motor vehicle accident on October 3, 2015, where she ended up upside down in a field and did not sustain any new injuries.

Dr. Sassman also recommended restrictions limiting lifting, pushing, pulling, and carrying to ten pounds rarely from the floor to waist; lifting, pushing, pulling and carrying ten pounds occasionally from waist to shoulder; lifting, pushing, pulling, and carrying ten pounds rarely above shoulder height; and limiting sitting, standing, and walking to occasional basis and with frequent position changes. In addition, she recommend no climbing on ladders and rarely using stairs.

On March 2, 2017, Snitker filed a petition for arbitration, contending she was permanently and totally disabled due to her work injury with Birdnow. Birdnow disputed the extent of her disability, and a hearing before a deputy commissioner was held on April 26, 2018.

Snitker testified about her work history and stated she enjoyed her work for Birdnow in car sales. However, after her injury, she was working only twenty-four hours a week, which translated into decreased sales and commissions. She found it hard to make a living working only part-time and decided to voluntarily leave her employment. Her job duties as a car salesperson included showing the vehicle, coming to a sales agreement with customers, delivering the vehicles, and moving them around the lot. Snitker had also worked as a finance manager in car sales and helped process credit applications. Snitker testified it was important to be known as an honest sales person. While she worked for Birdnow Motors, she received no disciplinary action for dishonesty.

Snitker testified that despite the many and varied treatments she has undergone over the years to help manage her pain, she continues to experience symptoms, which interfere with her daily life. She does everything more slowly. She is on medication she feels has diminished her mental sharpness and memory.

Snitker stated she struggles both mentally and physically. She is in pain twenty-four hours a day and sleeps poorly, waking up from pain throughout the night. She has hired help for tasks such as lawn care and snow removal. Snitker testified she is limited in how long she can tolerate sitting, standing, and walking.

Snitker testified she had qualified for Social Security (SS) Disability Benefits and submitted the disability determination report signed on September 13, 2017. The report indicated there had been a psychiatric review technique assessment, which noted Snitker "has had treatment for mostly physical ailments though symptoms and treatment of depression were noted in the file." This section of the report concluded:

> Despite her symptoms, [Snitker] is able to complete activities of daily living and mostly reported physical ailments for functional limitations. She endorse no issues with interpersonal relationships or authority. She endorsed some issues with memory and concentration but is able to follow directions. The claimant's statements regarding her functional limitations related to her mental [medically determinable impairments (MDIs)] are mostly consistent. [Snitker's] MDI is considered under listing 12.04 but does not meet or equal listing severity or cause more than a minimal effect on her functioning. These conditions are therefore considered non-severe.

Snitker's residual functional capacity (RFC) was evaluated, and her exertional limitations included, but were not limited to, occasional lifting or carrying twenty pounds, frequently lifting or carrying ten pounds, standing or walking a total of four hours of eight, sitting (with normal breaks) about six hours in an eight-hour workday, and occasional climbing stairs or ramps. The report noted a medical records review "reveals [Snitker] does have a history of degenerative disc disease of her lumbosacral spine." The report states:

> [Snitker] has a severe medically determinable impairment that does not meet or equal any listings. Considered is 1.04 for degenerative

disc disease and status post-operative intervention as described above. There is no evidence to support any foot pathology and little/no evidence of any significant ongoing radicular pathology in the lower extremities that would account for her complaints of foot pain. Treating sources do not make specific recommendations regarding [RFC]. [Snitker's] allegations are only partially consistent with the evidence of medical record due to discrepancies described above. All considered she would remain capable of the RFC as outlined.

The report indicates Snitker "is limited to less than a full range of light work."

Under the heading of "vocational explanation" the report states:

Although there are a few sedentary jobs in the same industry, they are not jobs that would be reasonable transfers in that they require skills that differed from the claimant's past duties and would require more than a minimal vocational adjustment. She does not have the vocational skills that would give her an advantage in the workplace to transfer to a significant amount of those possible options.

The disability adjudicator determined Snitker was "disabled."

The owner of Birdnow testified at the hearing that over time he began to doubt the veracity of Snitker's complaints. He said he saw her walking without a limp and she did not appear to be as incapacitated as she claimed.

Birdnow submitted several exhibits, including Dr. Miller's report following a second IME on December 20, 2017. In the December 2017 report, Dr. Miller opined:

I believe this patient's condition does arise directly from injury suffered February 8, 2013 that exacerbated an underlying condition of degenerative changes with spondylolisthesis. I do believe as stated previously that the injury February 8 was a material factor in her need for further treatment including surgery.
   Based on my evaluation of this patient I believe that no further treatment is necessary for this patient other than the previously recommended modest medication management I had discussed at the time I felt she was at MMI in February 2015 . . . . Based on her

ability to function in my examination and the videotape[2] I reviewed, combined with the lack of benefit of multiple procedures, and lack of recommended surgical procedures by [surgeon] Dr. Buchanan, I would recommend no further interventional treatment of any type be offered in the future. I again stated she is at [MMI] and has been since I saw her In February 2015. [MMI] does not imply the patient has reached the initial baseline prior to injury, simply that the patient has been stable and is likely to remain stable at present condition for the next six months. She clearly meets the definition.

    With regard to permanent impairment of this patient I previously estimated permanent impairment of this patient using the AMA fifth guidelines to be [twenty-one percent]. I do believe that was an error, and since the patient had a two level fusion she should have been placed at [twenty-two percent], with [one percent] additional for the second level as is recommended in the ROM method. This evaluation based on the charts on page 384. I will state that I believe Dr. Sassman made a couple errors in [her] attempt to rate this lady's impairment, which I reviewed. First [s]he referenced a DRE category for the neck on page 392 stating this would give a [twenty-eight percent] impairment. I believe this is simply an error that [s]he would've likely caught it [s]he had completed h[er] evaluation using the DRE method. However, [s]he instead chose to go to the ROM method. While this is allowable, a review of the AMA 6th guidelines states that the ROM method is notoriously unreliable and shows too much interindividual variation. For that reason it was removed in the subsequent guidelines.

Birdnow also submitted a report following the second FCE conducted by E3 Work Therapy Services on February 15, 2018. That report concluded the evaluation was invalid because Snitker over-reported symptoms and under-reported abilities when compared to observations made while Snitker was distracted.

Dr. Miller reviewed this FCE and, on March 3, 2018, prepared a revised opinion:

    Since the [FCE] is invalid, and felt to underestimate [Snitker's] residual capacity, and since [her surgeon] has not replied with safety

---

[2] This videotape was offered into evidence by Birdnow. The video is approximately twenty-minutes of footage taken during Snitker's wedding celebration, which Birdnow provided to Dr. Miller.

concerns, I am left with a situation where I must estimate residual capacity by observation.

I would assign the following permanent restrictions related to [Snitker's] February 8, 2013 work injury, to a level of medical certainty, for full time [forty-]hour per week employment: Lifting, maximum [forty pounds], repeated lifting during the day of [thirty pounds]. No nonmaterial handling restrictions, with the exception of deep squat greater than [ninety] degrees, including no restriction on sitting, walking, standing, bending, climbing, reaching including overhead. [Snitker] should need no more than routine breaks during the day.

Birdnow also submitted an industrial disability assessment by Ted P. Stricklett, M.S., conducted in February 2018. Stricklett determined there were positions available to Snitker based on Dr. Miller's restrictions including, but not limited to, collection representative, inside sales clerk, office clerk, telephone sales representative, and customer service associate. Given the region where Snitker lived and Dr. Miller's recommended work restrictions, Stricklett believed Snitker's loss of earning capacity—industrial disability—as a result of the work-related injury at approximately thirty-five percent.

On July 18, 2018, the deputy commissioner issued an arbitration decision finding Snitker suffered an industrial disability of forty percent. On intra-agency appeal, the commissioner adopted the deputy's findings and conclusions.

Snitker filed an application for judicial review. The district court concluded the agency's findings were supported by substantial evidence and its conclusions were not irrational, illogical, or wholly unjustifiable.

Snitker appeals, asserting some of the agency's fact findings were incorrect, which in turn affected its weighing of medical and vocational opinions and resulted in a ruling that is not supported by substantial evidence and an application of law to fact that was irrational, illogical, and wholly unjustifiable.

As is often repeated: "Our decision is controlled in large part by the deference we afford to decisions of administrative agencies." *Cedar Rapids Cmty. Sch. Dist. v. Pease*, 807 N.W.2d 839, 844 (Iowa 2011). "Judicial review of workers' compensation cases is governed by Iowa Code chapter 17A. On our review, we determine whether we arrive at the same conclusion as the district court." *Warren Props. v. Stewart*, 864 N.W.2d 307, 311 (Iowa 2015) (citation omitted). An agency findings of fact are upheld if supported by substantial evidence. *See Pease*, 807 N.W.2d at 845. "'Substantial evidence' means the quantity and quality of evidence that would be deemed sufficient by a neutral, detached, and reasonable person, to establish the fact at issue when the consequences resulting from the establishment of that fact are understood to be serious and of great importance." Iowa Code § 17A.19(10)(f)(1).

We set out the deputy's findings adopted by the commissioner:

> The primary dispute in this matter is the extent of the claimant's disability. . . .
>
> The experts agree claimant sustained ongoing chronic back pain as a result of her fall on February 8, 2013, which aggravated an underlying, and [formerly] asymptomatic, degenerative disease in the lumbar and sciatic region. As a result of this injury, [Snitker] has underwent physical therapy, medication management, fusion surgery, injections, and a spinal cord stimulator trial.
>
> Currently, she is on a battery of medications including narcotics which she takes up to four pills a day.
>
> Despite these multiple treatment modalities, [Snitker] continues to suffer from burning pain in her back which prevents her from working in the same capacity as she had prior to the injury.
>
> The symptoms recorded by Dr. Sassman during the 2015 [IME] and those recorded by Dr. Miller in the 2017 [IME] are quite different. Dr. Sassman found [Snitker] to have decreased sensation in the lumbar region, positive straight leg raise tests bilaterally, and an antalgic gait. Dr. Miller did not find any of these. Dr. Miller's results, however, were more in line with the physical examination of Dr. Kari on January 4, 2018. Dr. Kari recorded [Snitker]'s symptoms to include an antalgic gait, tenderness in bilateral buttock and

lumbosacral area, normal sensation, negative straight leg raise tests, negative facet loading maneuvers and positive sacroiliac tests.

Based in part on the invalid [FCE] as well as the observations of Dr. Miller who most recently saw [Snitker] in a medical capacity, it is determined that [Snitker] has not sustained a permanent total disability.

Even under the work restrictions assessed by Dr. Sassman, [Snitker] would still be able to undertake many of the tasks that she had prior to the work injury. Her previous job as a sales associate required very little lifting. She has been involved in processing financial paperwork, credit applications, and sales documents. Further, she has spent the last [twenty] years in a sales position. Since [Snitker]'s resignation from the defendant employer in March 2017, it does not appear that she has made any efforts to find new employment. *Her initial Social Security disability application was denied because she was working part-time and earning a substantial income. It was not until she added a mental component to her injury that the Social Security Administration found the [Snitker] to be disabled.*

There is no evidence in this case the [Snitker] has sustained a mental injury arising out of and in the course of her employment. [Snitker] testified that the medications that she takes renders her incapable of performing the more complicated financial duties that she undertook as a car salesperson; however, there are many jobs in the sales field which do not require extensive financial paperwork.

The vocational report prepared by Mr. Strick[lett] suggested the [Snitker] has sustained a nearly [sixty] percent loss of income and [thirty-five] percent decrease in earning capacity. Prior to her voluntary discharge from the defendant employer, [Snitker] was working approximately [twenty-four] hours a week. The work restrictions recommended by Dr. Sassman place [Snitker] in the light to sedentary work category. [Snitker's] past work experience in sales give her the skills to be able to work light to sedentary positions such as collection representative, inside sales clerk, office clerk, telephone sales representative, and customer service associate.

Taking all the foregoing into consideration, it is determined the [Snitker] has sustained a [forty] percent industrial loss.

Snitker objects to the emphasized language, arguing these findings were "key" to the agency's ruling and were "completely wrong." She notes there was no initial denial of her claim for SS disability benefits and the SS finding of disability is not based on mental-health conditions. We agree the agency's language is an erroneous interpretation of the SS determination of disability, which we set forth

more fully above [at pages 6-7].[3]  But we are not convinced this misinterpretation of the SS benefit award detracts from the agency's ultimate ruling of industrial disability.  The question is not whether the evidence supports a finding different than that of the agency but whether there is substantial evidence supporting the findings made.  *Pease*, 807 N.W.2d at 844–45.

Snitker objects to the agency's "implied" finding she was not credible.  She explains why her wedding video is not an accurate representation of her capabilities.  The deputy agreed, writing, "I find that the surveillance video holds little value.  It is a video of only a small section of one special day and does not provide insight as to claimant's day to day abilities."  The agency made no explicit finding of credibility.  The deputy accurately noted the employer testified he became more skeptical of Snitker's abilities as time passed.  And the deputy accurately reported the second FCE was found to be invalid.

---

[3] The SSA notice of award does note two claims for benefits and the deputy may have been confused by that.  However, one claim was for disability benefits and the other was for disabled widow's benefits.  The award letter reads in part:

> You are entitled to monthly disability benefits beginning March 2016.
>
> You are also entitled to disabled widow's benefits . . . beginning September 2016.  We are sending you another letter about these benefits.

Snitker's disability benefits start date was based on the date of her application.

With respect to Snitker's disability claim, she asserted she became disabled on February 8, 2013.  However, the evaluator determined:

> You said you are disabled because of low back and feet pain.  You said your condition prevent you from working as of 02-08-2013.  Additional information indicates that you were working and your earnings were considered substantial.  Due to Social Security Administrative rules, you cannot be considered disabled if you are working and your earnings are considered substantial.  Therefore, the earliest date you can be considered disabled is 12-31-2014.  Disability is established as of 12-31-2014.

The agency found Snitker's "past work experience in sales give her the skills to be able to work light to sedentary positions such as collection representative, inside sales clerk, office clerk, telephone sales representative, and customer service associate." The agency rationally explained Dr. Miller's observations of Snitker's symptoms and restrictions were "more in line with the physical examination of Dr. Kari on January 4, 2018" than Dr. Sassman's. The agency noted Snitker takes "a battery of medications," which she testified "renders her incapable of performing the more complicated financial duties that she undertook as a car salesperson." Yet, the agency found "there are many jobs in the sales field which do not require extensive financial paperwork." The agency also noted Stricklett's vocational report suggested Snitker sustained a thirty-five percent decrease in earning capacity. From our review of the record the agency considered proper factors pertinent to industrial disability and its determination was not irrational, illogical, or wholly unjustifiable.

Because there is substantial evidence supporting the agency's pertinent factual findings and the agency's industrial disability determination was based on proper factors and rationally explained, we affirm.

**AFFIRMED.**