# IN THE COURT OF APPEALS OF IOWA

No. 21-1650
Filed December 7, 2022

**MEDPLAST and CONTINENTAL INDEMNITY COMPANY,**
    Petitioners-Appellants,

**vs.**

**TIMOTHY PRUIS,**
    Respondent-Appellee.
_____

Appeal from the Iowa District Court for Polk County, Michael D. Huppert, Judge.

An employer appeals a district court's decision on judicial review affirming an award of workers' compensation benefits. **AFFIRMED.**

Lindsey E. Mills and Rachael D. Neff of Smith Mills Schrock Blades P.C., West Des Moines, for appellants.

Mark J. Sullivan of Reynolds & Kenline, L.L.P., Dubuque, for appellee.

Considered by Vaitheswaran, P.J., and Tabor and Badding, JJ.

**BADDING, Judge.**

In this appeal hinging on competing expert opinions, MedPlast and Continental Indemnity Company (MedPlast) challenge the district court's decision on judicial review to affirm the award of workers' compensation benefits to Timothy Pruis. MedPlast claims the court erred in affirming two findings by the Iowa Workers' Compensation Commission: (1) that Pruis sustained injuries to his head, neck, vision, and mental health as a result of a work injury; and (2) that Pruis was permanently and totally disabled. Because MedPlast's claims would require us to reweigh the expert opinions on these issues, we affirm.

I.     **Background Facts and Proceedings**

Timothy Pruis has worked in the plastic manufacturing industry since high school, where he got his start at his father's business. For most of his career, Pruis held supervisory positions, at times overseeing up to one hundred employees. His most recent job in that industry was at MedPlast as a third-shift production supervisor. During his shift, Pruis oversaw twenty to twenty-five employees and was responsible for keeping the production line moving.

On August 11, 2016, near the end of his shift, Pruis was called over to a plastic molding machine that was not functioning properly. Upon inspection, Pruis realized that he needed to climb into the machine to look at the injection mold. He grabbed a solid steel tie bar above his head to pull himself up. As he did so, Pruis hit the right side of his head on the bar. The impact "jarred his teeth," and he dropped back to the floor. Pruis said he saw little yellow stars and felt immediate pain in his neck, head, and shoulders.

Pruis went back to his office and laid his head back until the end of his shift. He vomited once while still at work. After his boss arrived, Pruis told him what happened. He does not remember much after that. Pruis drove himself home but got confused on the way and had to call his family for help. When Pruis got home, his daughter took him to the emergency room. Pruis was confused during the examination—not knowing his middle name or how many children he had. A CT scan of his cervical spine showed only degenerative changes, and a head CT showed no acute intracranial process. The emergency room provider assessed Pruis with a very severe concussion and traumatic brain injury. Because he needed a higher level of care than that particular facility could give him, he was transferred by ambulance to another area hospital.

Pruis was admitted overnight and, after twenty-four hours, his confusion had resolved. He reported no significant headaches with improved neck pain. An MRI showed no acute abnormalities. Pruis was discharged to the care of his family and told to stay off work until further evaluation. A week later, Pruis saw Dr. Steven Fowler for a follow-up. He reported that any activity triggered severe headaches and that his balance was slightly off. Dr. Fowler diagnosed Pruis with post-concussive syndrome, referred him to a concussion clinic, and told him to remain off work.

Pruis was never able to return to work at MedPlast because of his ongoing symptoms, which included daily headaches, nausea, difficulty concentrating and focusing, memory loss, balance and gait problems, and dizziness. He was seen by several doctors before making his way to Dr. DeAnn Fitzgerald via a referral from a neurologist about five months after his injury.

Dr. Fitzgerald is an optometrist with a general practice, who also runs Vision in Motion—a rehabilitation clinic for patients with traumatic brain injuries, strokes, and concussions. She is a certified credentialed ImPACT consultant and vice president of the Neuro-Optometric Rehab Association. Pruis first saw Dr. Fitzgerald at her general practice where she prescribed glasses and tinted lenses to help with his sensitivity to light. She also recommended visual/vestibular rehabilitation and multisystem therapy at her rehabilitation clinic. Pruis noticed an improvement in his balance and gait with those therapies, which also made his eyes work better together. Pruis received various treatments at the clinic for more than two years, during which time his symptoms continued to improve, though they remained present. Pruis's son, who drove him to the appointments with Dr. Fitzgerald, said his father's treatment there was the most helpful out of any that he had.

Despite the success Pruis experienced at Dr. Fitzgerald's clinic, MedPlast ended its authorization for further medical or mental-health treatment after neuropsychological assessments by its expert, Dr. Daniel Tranel. Pruis then experienced a significant regression in his symptoms, although he tried to continue what treatment he could afford on his own. At his initial examination with Dr. Tranel, Pruis underwent a battery of tests, which showed deficits in attention, working memory, speed of processing, mental control, and language. Yet Dr. Tranel concluded that Pruis's results did not show cognitive impairment or neurological dysfunction, suggesting they were due instead to Pruis's moderate symptoms of depression. Dr. Tranel ultimately concluded that the August 2016 work accident did not cause any permanent neurological or mental injury and that

Pruis was able to return to work with no restrictions. A later report from Dr. Tranel suggested Pruis was malingering because his condition had continued to decline.

MedPlast's other expert, Dr. R.L. Broghammer, concurred with Dr. Tranel. A specialist in occupational and environmental medicine, Dr. Broghammer found Pruis did not have any head condition related to his work injury, despite Pruis's continued symptoms. He noted that Pruis had a history of headaches before his work injury, along with degenerative changes of the cervical spine. Dr. Broghammer felt Pruis's vision issues were "due entirely to the aging process," disagreeing with Dr. Fitzgerald's contrary opinion connecting those issues with Pruis's work injury. In the end, Dr. Broghammer concluded that none of Pruis's conditions were related to his work injury. He too felt that Pruis did not need any further treatment and was able to return to work.

Pruis's experts and treating physicians disagreed. Dr. Todd Harbach, an orthopedic surgeon who treated Pruis's neck pain from November 2017 through January 2018, noted that Pruis had chronic degenerative changes in his cervical spine at C4–C5 and C5–C6. Unlike Dr. Broghammer, however, Dr. Harbach found that Pruis's "injury to his head, which also involves his cervical spine, lit up his pre-existing degenerative conditions." Occupational medicine specialist, Dr. Mark Taylor, agreed with that assessment following his independent medical examination of Pruis. Dr. Taylor diagnosed Pruis with persistent cervicalgia with right greater than left pain; paresthesia into the upper extremities and abnormal cervical spine MRI; traumatic brain injury with post-concussive syndrome and mild neurocognitive disorder; and persistent headaches and dizziness related to post-concussive syndrome, all of which he connected to Pruis's work injury.

As for Pruis's head injury and vision, Dr. Fitzgerald testified in a deposition that Pruis has poor "focus and attention" and would be unable to complete an eight-hour work day due to his "high fatigability." She stated that he will need ongoing therapy to improve his balance and cognition, without which he would continue to experience a decline in his memory and ability to concentrate. Dr. Fitzgerald concluded Pruis had suffered a 20% deficit in his right eye and a 10% deficit in his left eye.

An independent medical examination performed by Pruis's other expert, psychiatrist Dr. Kunal Patra, tracked these opinions. Pruis's son and daughter brought him to his appointment with Dr. Patra. Pruis's daughter told Dr. Patra that her father was a changed person in terms of his personality. He was quick to anger and low on patience. Pruis's son reported similar changes, noting that before his injury, Pruis was a very "self-reliant and proud" man who enjoyed outdoor activities and cooking. But after his injury, Pruis was "almost unrecognizable," according to his son, and barely able to do simple things, like cook a frozen pizza.

After visiting with Pruis's children, reviewing his medical records, and examining him, Dr. Patra found Pruis was suffering from major depressive disorder, mild neurocognitive disorder, personality disorder, generalized anxiety, and post-concussion syndrome. He linked those conditions to Pruis's traumatic brain injury stemming from the August 2016 work injury. Dr. Patra recognized that Pruis had depression before the accident but believed it was in remission because he was functioning well at work and in his family life. As for Dr. Tranel's opinion that Pruis's symptoms were "inconsistent with normal recovery trajectory" from mild traumatic brain injuries, Dr. Patra disagreed, explaining:

> While normal trajectory is something we can expect in most individuals, we cannot say that is the case with all individuals with mild traumatic brain injury. Studies have highlighted poor neuropsychological outcomes even among individuals with mild to moderate traumatic brain injury. . . . These impairments can hinder functional recovery including, cognitive readiness to work, to go to school, and in some cases independent living. About 10% of individuals with traumatic brain injury have persistent post concussive symptoms, including headache, fatigue, concentration difficulty, irritability, anxiety, depression, and sensitivity to light and noise.

Pruis suffered from all of those impairments, which Dr. Patra concluded were permanent. He assigned Pruis with a 22% whole person impairment.

In June 2019, Pruis petitioned for workers' compensation benefits, alleging injuries to his head, neck, vision, and mental health as a result of his August 2016 work injury. At the arbitration hearing, Pruis, his son, and his common-law wife testified about Pruis's ongoing symptoms. He still has headaches, which cause pressure in and behind his right eye, leaving him with a persistent level of pain. The pain gets triggered by loud noises, physical activity, looking at digital screens, and having to concentrate. His right eye is watery, and both eyes are sensitive to light. Pruis gets dizzy "every time he looks up." When that happens, he can barely walk and has to find the nearest place to lay down. Pruis stated he still has neck pain and numbness in his arm. He also has significant memory loss. Pruis can't remember his childhood, his children's birthdays, or people he used to know. His speech has become "gargled and slurred," and he has difficulty finding words. He will often go into a "zone[d] out" state.

After the hearing, the deputy commissioner ruled that Pruis sustained injuries to his neck, head, vision, and mental health as a result of his work injury, which rendered him permanently and totally disabled under the industrial disability

factors. On MedPlast's appeal from the deputy commissioner's decision, the commissioner affirmed the decision in its entirety. MedPlast then filed an unsuccessful petition for judicial review, leading to this appeal.

## II. Standards of Review

"Our decision is controlled in large part by the deference we afford to decisions of administrative agencies." *Cedar Rapids Cmty. Sch. Dist. v. Pease*, 807 N.W.2d 839, 844 (Iowa 2011). Iowa Code chapter 17A governs judicial review of decisions by the workers' compensation commission. *Neal v. Annett Holdings, Inc.*, 814 N.W.2d 512, 518 (Iowa 2012). The district court on judicial review serves as an appellate court to correct any legal error by the commissioner. *See Grundmeyer v. Weyerhaeuser Co.*, 649 N.W.2d 744, 748 (Iowa 2002). In reviewing the district court's ruling, we apply the relevant chapter 17A standard to decide whether we reach the same result as that court. *See Warren Props. v. Stewart*, 864 N.W.2d 307, 311 (Iowa 2015).

For MedPlast's causation challenge, we limit our review to whether the commissioner's finding is supported by substantial evidence when the agency record is viewed as a whole. *See* Iowa Code § 17A.19(10)(f) (2021); *Pease*, 807 N.W.2d at 844–45. "Evidence is substantial if reasonable minds could accept it as adequate to reach the same findings." *Tim O'Neill Chevrolet, Inc. v. Forristall*, 551 N.W.2d 611, 614 (Iowa 1996).

The industrial disability issue, on the other hand, is a mixed question of law and fact. *See Neal*, 814 N.W.2d at 525. We review the findings of fact for substantial evidence. *Id.* But as for the agency's application of law to those facts in making its industrial disability determination, "we will not disrupt the agency's

decision unless it is 'irrational, illogical, or wholly unjustifiable.'" *Id.* (citation omitted); *accord* Iowa Code § 17A.19(10)(m).

## III. Analysis

### A. Causation

"Expert testimony is ordinarily necessary to establish a causal connection between the injury and the disability for which benefits are sought." *Grundmeyer*, 649 N.W.2d at 752.

> The commissioner must consider such testimony together with all other evidence introduced bearing on the causal connection between the injury and the disability. The commissioner, as the fact finder, determines the weight to be given to any expert testimony. Such weight depends on the accuracy of the facts relied upon by the expert and other surrounding circumstances. The commissioner may accept or reject the expert opinion in whole or part.

*Id.* (cleaned up).

In weighing the competing expert opinions on Pruis's head, vision, and mental injuries, the deputy commissioner found that when viewing the record as a whole, "the opinions of Dr. Patra and Dr. Taylor are more persuasive than those of Dr. Tranel and Dr. Broghammer." The deputy reasoned:

> It is not known what records were provided to Dr. Tranel, but in his initial report, he incorrectly stated that Mr. Pruis went to the emergency room the day of the work accident, but then did not seek any medical care for several months [after] . . . . However, the records demonstrate that after Mr. Pruis was seen at the emergency room on the date of the injury he saw Dr. Fowler and underwent numerous physical and occupational therapy sessions prior to seeing [a neurologist]. Additionally, it is not clear from Dr. Tranel's report if he was aware of Mr. Pruis['s] pre-injury level of functioning. Mr. Pruis['s] job required that he was capable of supervising a workforce of up to 25 production workers and overseeing high-speed production of plastic injection molding products. Dr. Tranel does not explain how some of the low test results fit with Mr. Pruis['s] ability to perform his job prior to the injury. Additionally, Dr. Tranel initially stated (although later recanted) that Dr. Fitzgerald's treatment

actually made Mr. Pruis['s] conditions worse. This opinion is not consistent with what Mr. Pruis['s] own son . . . witnessed regarding that treatment. [He] credibly testified at the hearing . . . that the treatment helped reduce the frequency of the glazing over and foggy state that Mr. Pruis would otherwise experience on a frequent basis.

As for Pruis's neck injury, the deputy found "the opinions of Dr. Taylor and Dr. Harbach to be more persuasive than those of Dr. Broghammer." The deputy reached that conclusion because Dr. Broghammer "did not provide any convincing rationale to support" his opinion that "Pruis had multilevel cervical spondylosis with multilevel central canal and neural foraminal stenosis due to preexisting changes of the cervical spine" that were unrelated to the work injury.

MedPlast challenges these findings by the deputy, which were affirmed by the commissioner, arguing (1) Dr. Patra "only examined Pruis on one single occasion, over two years after the work injury" and "ignore[d] Pruis's history" of taking Prozac to treat his depression before the work injury; (2) Dr. Fitzgerald lacked a complete "understanding of Pruis's pre-injury vision condition"; (3) "Pruis did not seek medical care for his alleged neck condition until November 2017, over one year after the work injury"; and (4) MedPlast's experts were more qualified than Pruis's, who failed to account for his preexisting conditions.

Distilled down, all of these arguments simply ask us to reweigh the competing expert opinions. "But such weighing is outside our mission." *ConAgra Foods, Inc. v. Moore*, No. 21-0339, 2022 WL 1658707, at *3 (Iowa Ct. App. May 25, 2022). It is instead "within the 'peculiar province' of the commission whether to accept or reject an expert opinion." *Id.* (quoting *Pease*, 807 N.W.2d at 845); *accord Arndt v. City of Le Claire*, 728 N.W.2d 389, 394 (Iowa 2007) ("Making a determination as to whether evidence 'trumps' other evidence or whether one

piece of evidence is 'qualitatively weaker' than another piece of evidence is not an assessment for the [reviewing court] to make . . . .").  Neither the district court, nor this court on appeal, is "at liberty to accept contradictory opinions of other experts in order to reject the finding of the commissioner," *Pease*, 807 N.W.2d at 850, which is what MedPlast would have us do.  Because the agency's findings are supported by substantial evidence in the record, we affirm.

### B.      Industrial Disability

Permanent total disability is determined by the employee's industrial disability.  *Hill v. Fleetguard, Inc.*, 705 N.W.2d 665, 673 (Iowa 2005).  Industrial disability is "based upon a loss in earning capacity, which rests on a comparison of what the injured worker could earn before the injury as compared to what the same person could earn after the injury."  *Id.* (citation omitted).  Loss of earning capacity is determined "by considering the employee's functional impairment, age, education, work experience, qualifications, ability to engage in similar employment, and adaptability to retraining to the extent any of these factors affect the employee's prospects for relocation in the job market."  *Id.*  The agency considered these and other factors in finding that fifty-nine-year-old Pruis was "permanently and totally disabled as a result of the August 11, 2016 work injury."

MedPlast's primary argument against this finding is that "Pruis has conclusively and unequivocally demonstrated his ability to return to gainful employment in the competitive labor market."  MedPlast points out that after his work injury, Pruis was employed at Home Depot for about two months and then at Harbor Freight Tool for close to one year.  But the work he did for those employers—things like attaching UPC labels and pricing information on

merchandise, stocking shelves, and setting displays—was a far cry from the skilled labor he performed in plastic manufacturing for his entire work career. Tellingly, Pruis never returned to work with MedPlast before it closed the plant in 2018. *See Clark v. Vicorp Rests., Inc.*, 696 N.W.2d 596, 606 (Iowa 2005) (recognizing the "principle that an employer's refusal to give any sort of work to a claimant after the claimant suffers a work-related injury may justify an award of disability").

As for the jobs Pruis was able to obtain, the deputy found he resigned from Home Depot "because he knew he was going to be terminated due to poor attendance." And at Harbor Freight, Pruis again quit instead of "being terminated for poor performance" after being written up for problems with the cash register. His son, who went to visit him at that job, testified that unlike Pruis's past supervisory employment where he was the "go-to guy," his Harbor Freight co-workers "said they had to watch him very closely and follow him around." This fits with Dr. Patra's conclusions about Pruis's employability, specifically that his "cognitive functioning coupled with his underlying mood and anxiety issues make it quite difficult for him to currently manage responsibilities in a dynamic and competitive job environment." On top of those issues, Pruis was physically limited in lifting; working with computers; and exposure to heights, loud machinery, or heavy equipment.

These factors led Pruis's vocational expert to conclude that he would be "unable to perform any jobs in the labor market." The commission credited that expert's opinion over the opinions of MedPlast's vocational experts, with the deputy finding that no one from those experts' agency "ever contacted Mr. Pruis, spoke to him, or offered him any assistance in updating his resume or obtaining

employment. Given Mr. Pruis['s] difficulty with wor[d] finding and poor performances in interviews, I find [that] failure to even speak with Mr. Pruis disturbing." *See Arndt*, 728 N.W.2d at 395 ("The reviewing court only determines whether substantial evidence supports a finding according to those witnesses whom the commissioner believed." (cleaned up)). The deputy further noted that Pruis contacted all of the jobs listed in MedPlast's vocational reports and "was told either they were not hiring or that he was under or over qualified."

In the end, the commissioner affirmed the deputy's finding that

> Pruis has demonstrated that he is motivated to return to the workforce. He has applied for and even interviewed for numerous jobs. He was able to secure employment with two employers since the accident. Unfortunately, those periods of employment were unsuccessful. Even during the time when he was able to remain employed, Mr. Pruis struggled to perform his job duties and would come home at the end of his shift mentally and physically exhausted.
> . . . Pruis has made a reasonable, but unsuccessful effort to find steady employment. Considering [Pruis's] age, educational background, employment history, inability to retrain, motivation to return to the workforce, permanent impairment, and permanent restrictions, and the other industrial disability factors set forth by the Iowa Supreme Court, . . . he has proven he is permanently and totally disabled as a result of the August 11, 2016 work injury.

"Because the agency considered the proper factors in assessing the claimant's industrial disability and because the agency's findings with respect to those factors are supported by substantial evidence," *Keystone Nursing Care Ctr. v. Craddock*, 705 N.W.2d 299, 307 (Iowa 2005), we affirm the commissioner's award of permanent total disability benefits to Pruis.

**AFFIRMED.**